■ LORI ALBUNIO et al., Respondents, v CITY OF NEW YORK et al., Appellants. ROBERT SORRENTI, Respondent, v CITY OF NEW YORK et al., Appellants. [889 NYS2d 4]—

Judgments, Supreme Court, New York County (Martin Shulman, J.), entered November 8, 2007, after a jury trial, respectively, inter alia, awarding plaintiff Robert Sorrenti the principal sum of $491,706 against the City of New York and awarding his attorneys, Meenan & Associates, LLC, by Colleen M. Meenan, Esq., attorney's fees in the amount of $366,323.75, unanimously affirmed, without costs. Judgment, same court and Justice, entered November 9, 2007, after a jury trial, inter alia, awarding plaintiff Lori Albunio $579,728.83 and plaintiff Thomas Connors $588,113.45 against the City of New York, affirmed,

without costs. Appeal from order, same court and Justice, entered on or about August 30, 2007, unanimously dismissed, without costs, as subsumed in the appeals from the aforesaid judgments. Judgment, same court and Justice, entered November 9, 2007, awarding attorney's fees to counsel for plaintiffs Albunio and Connors, affirmed, without costs.

In support of their respective retaliation claims, plaintiffs Albunio and Connors both produced credible evidence of reductions in their supervisory responsibilities, interference with and loss of their job advancement opportunities, and other acts "reasonably likely to deter a person from engaging in protected activity" (Administrative Code of City of NY § 8-107 [7]). Both engaged in protected "opposition" activity, by advocating for plaintiff Sorrenti's transfer to the Youth Services Section (YSS) of the Deputy Commissioner of Community Affairs despite defendant James Hall's animus towards him (see Crawford v Metropolitan Government of Nashville and Davidson County, Tennessee, 555 US —, —, 129 S Ct 846, 851 [2009]). After advocating for Sorrenti, both Albunio and Connors were shut out of meetings. Albunio was told to find another command and was forced to take a position viewed as a demotion in a less desirable assignment. Connors's tours of duty were changed in ways that made "no sense" and prevented him from properly supervising staff, and when he sought to transfer out of YSS, having seen "the writing on the wall," he was not given the position he had been promised on transfer orders but instead was assigned the job of integrity control officer, a position he viewed as a demotion.

Both Albunio and Connors produced evidence of a causal connection between their protected activity and the adverse employment action taken against them (see Koester v New York Blood Ctr., 55 AD3d 447, 448-449 [2008]). Both had exemplary work records before the Sorrenti affair, but, after advocating for Sorrenti, their authority was eroded, Albunio was stripped of her command, and both were forced to transfer out of YSS to positions that were viewed as demotions.

Albunio and Connors also established that they were constructively discharged by producing evidence that their working environments had been made objectively so intolerable that a reasonable person in their respective positions would have felt compelled to leave (see Gonzalez v Bratton, 147 F Supp 2d 180, 197-198 [SD NY 2001], affd 48 Fed Appx 363 [2d Cir 2002]). It was for the jury to decide whether each plaintiff's resignation was temporally too remote from the retaliatory conduct (id. at 198). It could reasonably have concluded that neither plaintiff

could afford to give up valuable pension rights and would have lost valuable pension benefits by resigning before completing 20 years of service.

The jury's determination to award Sorrenti $491,706 in compensatory damages was supported by the evidence. Sorrenti's treating psychiatrist, Dr. Salvatore Ambrosino, testified that the cause of Sorrenti's major reactive depression was that he was being stereotyped as a pedophile. Sorrenti testified to the damage to his reputation and professional career caused by his being perceived as a gay man and stereotyped as a child molester. The record showed that he endured anxiety and panic attacks, experienced suicidal ideation, and took numerous medications to combat depression and anxiety. While Sorrenti had been diagnosed with a reactive depression following an incident with another police officer in 1999, the jury was entitled to credit Ambrosino's testimony that the events of 2002-2003, and in particular being stereotyped as unfit to be around children, was the cause of the current reactive depression. The award did not deviate materially from what would be reasonable compensation (CPLR 5501 [c]; *see Matter of Town of Hempstead v State Div. of Human Rights*, 233 AD2d 451 [1996], *appeal dismissed* 89 NY2d 1029 [1997], *lv denied* 90 NY2d 807 [1997]).

The trial court's evidentiary rulings were proper and did not deprive defendants of their right to a fair trial.

The awards of attorneys' fees to plaintiffs' attorneys were not excessive (*see e.g. Gonzalez v Bratton*, 147 F Supp 2d at 211-212; *Wahad v Coughlin*, 870 F Supp 506 [SD NY 1994]). Concur—Mazzarelli, J.P., Saxe, DeGrasse and Abdus-Salaam, JJ.

Catterson, J., dissents in part in a memorandum as follows: Because I do not believe that, prior to her transfer and purported demotion, Captain Lori Albunio engaged in the protected activity required to make out a retaliation claim, I must respectfully dissent in part.

This case arises from the events surrounding an unsuccessful application by former Police Sergeant Robert Sorrenti for a position at the New York City Police Department's Youth Services Section (hereinafter referred to as YSS). The following facts are undisputed: Lori Albunio graduated from the Police Academy in 1985 at the age of 21. Over the next 15 years she received several promotions, rising to the rank of captain in 1999. In February 2001, she was assigned as commanding officer of YSS, a subcommand of the Deputy Commissioner of Community Affairs. Inspector James Hall became Albunio's supervisor in early 2002.

In July or August 2001, Albunio received an application from

Sergeant Sorrenti for a position at YSS. Although there was not a job opening at the time, Albunio, accompanied by Administrative Sergeant Steven Gilmartin, conducted a standard interview of Sorrenti and found him qualified for the position. His prior evaluations were "very, very good," and he came "highly recommended" for the position. Albunio rated him as having "above average potential."

When a vacancy opened up in April 2002, Albunio submitted a request to Hall for Sorrenti to fill that vacancy. Although Hall's approval of these requests was usually a formality, he wished to reinterview Sorrenti and to interview an additional officer, a Sergeant Nicholson, for the position. Hall had not previously participated in any interviews at YSS.

At trial, Albunio testified that she and Hall interviewed Sorrenti in May 2002; Hall asked most of the questions. Hall asked Sorrenti several questions about his marital status and family and about an incident in which Sorrenti had loaned money to another male officer. Immediately after the interview, Hall told Albunio that "there was something not right about that guy." Albunio thought Hall believed that Sorrenti was gay. Immediately thereafter, Hall and Albunio interviewed Nicholson whom Albunio believed to be less qualified for the position than Sorrenti.

A week or two later, Albunio asked Hall whether he had decided between Nicholson or Sorrenti. According to Albunio's testimony, Hall replied that he had requested Nicholson because he had "found out some f—d up s—t" about Sorrenti and "wouldn't want him around children." Albunio testified that this further indicated to her that Hall believed Sorrenti to be gay and that he had denied him the transfer for that reason.

However, Albunio acknowledged that she did not tell anybody of her belief because she feared that it "would have [ended her career] right then and there." Nor does the record reflect that she raised any objections when Nicholson, and not Sorrenti, began working at YSS in 2002, or even that she confronted Hall to determine exactly what he had discovered about Sorrenti that disqualified him as a candidate.

On October 31, 2002, after hearing rumors that she was being transferred, Albunio requested a meeting with Hall's supervisor, Deputy Commissioner Frederick Patrick. Hall was present at the meeting. Patrick confirmed that they were considering replacing Albunio at YSS. When she asked why, Hall interjected, stating that Albunio had used "poor judgment when requesting personnel" who would embarrass him and Commissioner Patrick. Hall cited Sorrenti as the primary

example, and gave one other. When Albunio objected that her performance had not previously been criticized and that she believed Sorrenti to be the more qualified candidate for the YSS position, Hall responded that she should have been "more detailed" in investigating Sorrenti.

The record does not reflect that Albunio asked for any further explanation of that evaluation, much less that she voiced her belief that Hall had discriminated against Sorrenti. Albunio asked to see her most recent performance evaluation, which was past due, but was told by Hall that she would see it at a later date.

To avoid the administrative transfer—under which she could be transferred anywhere—Albunio transferred to Transit District One (hereinafter referred to as Transit) as executive officer, second in command. Albunio testified that, even though her pay was the same, she was in a less desirable office, with less desirable hours, and lost several perks of working in YSS. Additionally, while YSS was a "highly political" and "influential" position, there was no opportunity for advancement from Transit, and Albunio went from being commanding officer at YSS to second-in-command at Transit.

On January 9, 2003, Albunio read in a newspaper that Sorrenti was suing the New York Police Department, claiming discrimination. On January 13, 2003, she filed a complaint with the Office of Equal Employment Opportunity (hereinafter referred to as the OEEO), alleging that Hall had retaliated against her because she advocated for Sorrenti, whom Hall perceived to be gay. Albunio recited the facts of Sorrenti's application process to YSS, and alleged Hall told her she was going to lose her command because she used poor judgment in selecting personnel that would embarrass him and Patrick. The complaint also addressed her overdue performance evaluation for the period of July 1, 2001 to June 30, 2002.

On January 15, 2003, Albunio gave testimony in the investigation of an OEEO complaint filed by plaintiff Thomas Connors regarding the same incident. In July 2003, Albunio was finally permitted to see her overdue performance evaluation. The evaluation was signed by Deputy Inspector Ivan Dilan and by Hall as the rater and the reviewer respectively. Consistent with her earlier evaluations, her overall rating was four out of five: above standards. However, the comments included criticisms that were not present in past evaluations. In relevant part, Hall wrote: "In order to reach her maximum potential as the Commanding Officer of Youth Services Section the ratee needs to assert herself in the area of command presense [sic]. Although delegat-

ing is essential when in command of a unit, it should not compromise the commanders [*sic*] image as leader of that unit. Improvement in this area can be achieved by the ratee demonstrating more of a 'hands-on' approach to the strategic direction of the command."

Albunio claims that these concerns were never raised with her before she was shown the performance evaluation. The evaluation was dated August 29, 2002.

After receiving her performance evaluation, Albunio filed a second complaint with the OEEO claiming that the negative evaluation was falsified by Hall and filed in retaliation for requesting that Sorrenti join YSS. Additionally, she filed an appeal of her performance evaluation in August 2003, which was not resolved by the date of the trial.

Also in August 2003, Albunio suffered a line-of-duty injury to her shooting hand and was placed on limited duty. She testified that she believed this precluded her from receiving promotions. Albunio applied for transfer to Internal Affairs but never received an interview. She retired from the Police Department in July 2005, testifying that it was "obvious" that she was not going to be promoted to deputy inspector, a discretionary promotion, and that her career was over. She testified that, had this series of events not occurred, she would have stayed on the force for 25 years.

Albunio initially filed her complaint jointly with plaintiff Thomas Connors against the City of New York and against Hall and Patrick in their official capacities (hereinafter collectively referred to as the City) on July 16, 2003. The complaint alleged that Albunio recommended Sorrenti for a position at YSS based on his interview and qualifications; that Hall perceived Sorrenti to be gay and objected to Albunio's recommendation for that reason; that Albunio continued to advocate for Sorrenti; and that, as a result, she was retaliated against. The complaint alleged causes of action under the New York State Human Rights Law (Executive Law § 290 *et seq.*) (hereinafter referred to as the state Human Rights Law) and the New York City Human Rights Law (Administrative Code of City of NY § 8-101 *et seq.*) (hereinafter referred to as the NYCHRL). The complaint was later amended to allege continuing retaliatory acts by the defendants for Albunio's support of Sorrenti and the filing of OEEO complaints, and to allege constructive discharge.

The jury found, inter alia, that Hall, acting in his official capacity, had discriminated against Sorrenti because of his perceived sexual orientation, and that Hall retaliated against Albunio for either opposing the alleged discrimination against

Sorrenti or filing an EEO complaint, but that neither Patrick nor any other employees of the City had retaliated against Albunio. The jury awarded Albunio $479,473 in lost earnings against the City.

On appeal, the City asserts, inter alia, that Albunio did not engage in any protected activity prior to her transfer to Transit. I agree, and, for the reasons set forth below, I would reject Albunio's retaliation claim. In my opinion, Albunio did not establish the essential element of engaging in protected activity.

Albunio's claim arises under Administrative Code § 8-107 (7), which provides, in relevant part: "It shall be an unlawful discriminatory practice . . . to retaliate or discriminate in any manner against any person because such person has (i) opposed any practice forbidden under this chapter, (ii) filed a complaint, testified or assisted in any proceeding under this chapter, (iii) commenced a civil action alleging the commission of an act which would be an unlawful discriminatory practice under this chapter, (iv) assisted . . . in an investigation commenced pursuant to this title, or (v) provided any information to the commission pursuant to the terms of a conciliation agreement."

For her retaliation claim to succeed under this section, Albunio must "show that (1) she has engaged in protected activity, (2) her employer was aware that she participated in such activity, (3) she suffered an adverse employment action based upon her activity, and (4) there is a causal connection between the protected activity and the adverse action." (*Forrest v Jewish Guild for the Blind*, 3 NY3d 295, 312-313 [2004]; *see also Koester v New York Blood Ctr.*, 55 AD3d 447, 448-449 [1st Dept 2008].)

Albunio asserts that when she persisted in advocating for Sorrenti's transfer into YSS she was opposing discrimination, and therefore was engaged in a protected activity. (*See Forrest*, 3 NY3d at 313.) However, even giving deference to the jury's determination that Albunio was transferred as a result of her support of Sorrenti, I do not believe that her actions were the type of opposition required by the NYCHRL. Albunio testified that she "opposed" Hall by not withdrawing her request for Sorrenti, retaining his application on file, and maintaining that he was qualified at the meeting where she was informed of her impending transfer.

At no point did she testify that she expressed a belief that Sorrenti was the victim of discrimination. By her own admission, she "kept it to [her]self" and told no one. Additionally, Albunio acquiesced in Hall's decision to hire Nicholson over Sorrenti. Indeed, the record reflects that Albunio did not at any point elicit from Hall any acknowledgment that he believed Sor-

renti to be homosexual; nor did Albunio ever voice her belief to Hall, or anyone else, that Hall thought so.

In my opinion, Albunio's silence on the question of discrimination—even if motivated by a legitimate fear for her job—precludes her from claiming that she "opposed" Hall's discriminatory behavior.

Albunio argues incorrectly that case law has found protected activity that falls short of an express objection. The sole New York case she cites for that proposition is *Mariotti v Alitalia-Line Aeree Italiane-Societa per Azioni* (2008 NY Slip Op 32160[U] [Sup Ct, NY County 2008]). In that case, the plaintiff engaged in protected activity when he told his employer that it was impermissible to discriminate on the basis of age and then refused to fire an older employee. Unlike Albunio, the plaintiff expressly objected to the discrimination at issue and, in fact, *disobeyed* a discriminatory order.

Albunio's reliance on federal cases *interpreting* similar language in title VII of the Civil Rights Act of 1964 (42 USC § 2000e *et seq.*) is similarly unavailing. (*See e.g. Rucker v Higher Educ. Aids Bd.*, 669 F2d 1179 [7th Cir 1982]; *Tidwell v American Oil Co.*, 332 F Supp 424 [D Utah 1971]; *see also* Local Civil Rights Restoration Act of 2005 [hereinafter referred to as the Restoration Act] [Local Law No. 85 (2005) of City of New York § 1] ["Interpretations of New York state or federal statutes with similar wording may be used to aid in interpretation of the New York City Human Rights Law"]; *cf.* 42 USC § 2000e-3.)

These cases also involve plaintiffs who spoke out against discrimination. For example, in *Rucker*, the plaintiff disobeyed a direct order to fire an employee for a discriminatory reason and the other employee was not fired. The Seventh Circuit found *Rucker* to be "a retaliation case in a more fundamental sense" than in the usual cases where an employee is fired for having made a charge of discrimination that was not validated since "[the plaintiff's] prompt and vigorous opposition *averted* unlawful discrimination." (669 F2d at 1182 [emphasis added].)

This stands in sharp contrast with Albunio's actions, which amounted to rating Sorrenti as qualified for the job and then asking Hall whether he had made a decision on the vacant position. Albunio may have harbored suspicious thoughts, but she did not act on them.

The aforementioned cases consistently support the proposition that whenever an employee acts against discrimination, even if he/she does so through unofficial means, that employee is protected. In this manner, the term "opposition" has been broadly construed. In my opinion, Albunio's support of a

candidate based on his qualifications does not constitute "opposition" against discrimination simply because the candidate is believed by some to be gay. Moreover, I believe that any faithful reading of the NYCHRL itself demonstrates that it cannot provide protection for Albunio in this case.

As in title VII, "opposed" carries its ordinary meaning in the NYCHRL. (*See Crawford v Metropolitan Government of Nashville and Davidson County, Tennessee*, 555 US —, —, 129 S Ct 846, 850 [2009]; *cf.* Administrative Code § 8-107 [7] *with* 42 USC § 2000e-3 [a] ["It shall be an unlawful employment practice . . . to discriminate against any individual . . . because he has opposed any . . . unlawful employment practice"].) Webster's Dictionary defines "oppose" as "to confront with hard or searching questions or objections," or, inter alia, "to offer resistance to, contend against, or forcefully withstand." (Webster's Third New International Dictionary 1583 [3d ed 1993].) To oppose a practice, then, it is not enough merely to disagree with it or harbor an unarticulated belief that it is wrong; one must confront the actor or resist the practice.

These definitions square neatly with the interpretations of title VII given in the Equal Employment Opportunity Commission Compliance Manual (hereinafter referred to as the EEOC Manual), which provides clear standards regarding what is and is not opposition under the statute, and with the New York City Council's interpretations of the NYCHRL. (*See* Rep of Comm on Gen Welfare on Local Civil Rights Restoration Act of 2005, 2005 NY City Legis Ann, at 536) ("[the standard applied to retaliation claims under the NYCHRL] is in line with the standard set out in guidelines of the [EEOC]"). The EEOC Manual defines opposition as when "an individual explicitly or implicitly communicates to his or her employer . . . a belief that its activity constitutes a form of employment discrimination" (EEOC Manual § 8-II [B] [1], at 8-3 [1998], available at http://www.eeoc.gov/laws/guidance/compliance.cfm [accessed Nov. 12, 2009], cached at http://www.nycourts.gov/reporter/webdocs/Compliance_Manual.htm). The EEOC Manual clarifies further with several examples, one of which is particularly instructive: where an employee who is a member of a protected class states that his salary is unfairly low, but does not state that he believes he is being subjected to wage discrimination based on his membership in that protected class, he is *not* engaging in protected "opposition" conduct. (§ 8-II [B] [2], at 8-4.) This is virtually identical to the instant case, where Albunio has claimed that she opposed the decision not to hire Sorrenti, but did not oppose it on the grounds that it was discriminatory.

At the heart of these definitions is the protection of *actions taken against* discrimination, not the protection of privately held, unexpressed beliefs. However broadly "opposing discrimination" may be construed, an employee must give voice to that opposition before the law's protection applies. (*See Crawford,* 555 US at —, 129 S Ct at 853 n 3.) The language does not extend this protection to those who are perceived as supporting a member of a protected class for promotion.

Under this reading of the NYCHRL, I think it is clear that Albunio did not oppose the discrimination against Sorrenti. Merely stating her belief that Sorrenti was the better candidate is a far cry from suggesting that Hall's differing opinion and selection of an alternative candidate were the result of discrimination.

Albunio further argues that the analogies to state and federal law are inappropriate because the Restoration Act establishes these bodies of law merely "as a floor below which the City's Human Rights law cannot fall, rather than a ceiling." However, I believe this observation is largely immaterial. First, the Restoration Act was enacted more than two years after Albunio's transfer to Transit. Second, the amendments made by the Restoration Act expanded only the language defining an adverse employment action; there is no indication that this effected an expansion of the definition of opposition or protected activities beyond their original construction.

Moreover, even if this case were determined on equitable grounds, Albunio's self-acknowledged actions could not be considered protected activity. The law protects those who speak out because antidiscrimination schemes depend in large part on the willingness of individuals to act against discrimination. (*Cf.* EEOC Manual § 8-I [A], at 8-1 ["enforcement . . . depend(s) in large part on the initiative of individuals to oppose . . . discrimination"].) In the absence of such protection, those who might otherwise oppose discrimination would be able to do so only at great personal peril.

I acknowledge that Albunio had a legitimate fear of reprisals if she voiced her objections; however the sole purpose of the retaliation statute is to allay concerns and encourage action in precisely this sort of situation. I cannot support a decision that would hold that her minimal activity is protected by a statute enacted to encourage and protect action when Albunio chose not to act or speak out. I would find, instead, that Albunio first engaged in protected activity on January 13, 2003, when she filed her first OEEO complaint. Because it occurred after her transfer, the filing of that complaint cannot support a finding against Hall that her transfer was retaliatory.

Albunio further argued that the performance evaluation she received covering 2001 to 2002 was another adverse employment action. However, Albunio received a four out of five rating and was marked "above standards." The only criticism she points to from Hall are statements that she needed to delegate less to reach her maximum potential as a leader. I would find, as a matter of law, that this is insufficient to be considered adverse action, and therefore cannot support a finding of retaliation.

Accordingly, I would find that Albunio did not present a valid case for retaliation under the NYCHRL, and would therefore modify the jury verdict in favor of the defendants with respect to Albunio's retaliation claim. I otherwise concur with the majority. [*See* 2007 NY Slip Op 32695(U).]