472

[947 NE2d 135, 922 NYS2d 244]

LORI ALBUNIO et al., Respondents, v CITY OF NEW YORK et al., Appellants.

ROBERT SORRENTI, Plaintiff, v CITY OF NEW YORK et al., Appellants.

Argued February 10, 2011; decided March 31, 2011

**POINTS OF COUNSEL**

*Michael A. Cardozo, Corporation Counsel,* New York City (*Julie Steiner* and *Barry P. Schwartz* of counsel), for appellants. I. As a matter of law, neither plaintiff Lori Albunio nor plaintiff Thomas Connors engaged in protected opposition activity when

they advocated for fellow police officer plaintiff Robert Sorrenti's transfer. That is because Albunio and Connors failed to directly or indirectly communicate to defendant James Hall their beliefs that he was discriminating against Sorrenti based on his perceived sexual orientation. Both Albunio and Connors kept their beliefs to themselves and only supported Sorrenti's transfer because they believed he was the better more qualified candidate for the position. (*Forrest v Jewish Guild for the Blind*, 3 NY3d 295; *Koester v New York Blood Ctr.*, 55 AD3d 447; *Rucker v Higher Educ. Aids Bd.*, 669 F2d 1179; *Womack v Munson*, 619 F2d 1292; *Tidwell v American Oil Co.*, 332 F Supp 424; *Mariotti v Alitalia-Line Aeree Italiane-Societa per Azioni*, 2008 NY Slip Op 32160[U]; *Barber v CSX Distrib. Servs.*, 68 F3d 694.) II. Even after plaintiffs Lori Albunio and Thomas Connors engaged in protected opposition activity when they subsequently filed their Office of Equal Employment Opportunity complaints, neither demonstrated that, as a result, they suffered any adverse employment action. As such, both Albunio and Connors failed, as a matter of law, to support their retaliation claims.

*Law Offices of Mary D. Dorman*, New York City (*Mary D. Dorman* and *Paul O'Dwyer* of counsel), for respondents. I. Lori Albunio and Thomas Connors engaged in protected opposition conduct when they continued to advocate for Robert Sorrenti's transfer even after James Hall made clear to them that he would not approve the transfer because of Sorrenti's perceived sexual orientation. (*Rucker v Higher Educ. Aids Bd.*, 669 F2d 1179; *Womack v Munson*, 619 F2d 1292; *Tidwell v American Oil Co.*, 332 F Supp 424; *Mariotti v Alitalia-Line Aeree Italiane-Societa per Azioni*, 2008 NY Slip Op 32160[U]; *Barber v CSX Distrib. Servs.*, 68 F3d 694; *Fogleman v Mercy Hosp.*, 283 F3d 561.) II. Lori Albunio engaged in protected activity when she was identified in and testified in support of Robert Sorrenti's Office of Equal Employment Opportunity (OEEO) complaint, filed her own OEEO complaints, and as a result, suffered acts reasonably likely to deter a person from engaging in protected activity. (*Gonzalez v Bratton*, 147 F Supp 2d 180; *Hashimoto v Dalton*, 118 F3d 671; *Equal Empl. Opportunity Commn. v L.B. Foster Co.*, 123 F3d 746; *Hillig v Rumsfeld*, 381 F3d 1028; *Forrest v Jewish Guild for the Blind*, 3 NY3d 295; *Koester v New York Blood Ctr.*, 55 AD3d 447.) III. Thomas Connors engaged in protected activity when he filed an Office of Equal Employment Opportunity (OEEO) complaint on behalf of Robert Sorrenti and filed two subsequent OEEO complaints against James Hall and others for retaliation. (*Hicks v Baines*, 593 F3d 159; *Ray v*

*Henderson,* 217 F3d 1234; *Bryant v Begin Manage Program,* 281 F Supp 2d 561; *Burlington N. & S. F. R. Co. v White,* 548 US 53.)

**OPINION OF THE COURT**

SMITH, J.

A jury found that two members of the New York City Police Department, Captain Lori Albunio and Lieutenant Thomas Connors, were subjected to retaliation because they opposed discrimination against a third member of the department, Sergeant Robert Sorrenti, on the basis of Sorrenti's perceived sexual orientation. We hold that there is sufficient evidence in the record to support the verdict.

I

Albunio was commanding officer of the Youth Services Section of the Police Department. Connors was operations coordinator of the section, and reported to Albunio. Sorrenti, then serving in another command, applied in 2001 to be transferred into the Youth Services Section. Albunio interviewed him, and was favorably impressed; when a position opened in April 2002 in a Youth Services program known as DARE, in which police officers educate New York City school children about the dangers of drugs, she requested that Sorrenti be chosen to fill the vacancy. The request was submitted to Inspector James Hall, who had recently become commanding officer of Community Affairs, and Albunio's immediate supervisor. Hall decided to interview Sorrenti himself, and did so, with Albunio present, on May 13, 2002.

From this point on, the facts were sharply disputed at trial, but the jury could have found the following: At the May 13 interview, Hall asked Sorrenti whether he was married, and whether he had children. He also questioned Sorrenti aggressively about Sorrenti's relationship with another male police officer to whom Sorrenti had loaned money, saying loudly, among other things: "You were more than just friends." Sorrenti became visibly uncomfortable with the questions. After the interview, Hall told Albunio "that there was something not right about that guy." Hall later chose another person for the open position with DARE, telling Albunio that he "found out some fucked up shit about Sorrenti and . . . wouldn't want him around children." Albunio's interpretation of this statement was: "[T]he guy must think the guy is gay and for some reason doesn't want him around kids."

In June or July of 2002, Hall called Connors into Hall's office and began to speak to him about Sorrenti, angrily and with the use of many expletives. He talked about Sorrenti's loan to his fellow officer, saying "[there] must be more between this cop and Sergeant Sorrenti," and added that he "wouldn't be able to sleep at night knowing that Sorrenti is going to be working around kids." Connors responded that he thought Sorrenti "would be more than qualified to work around kids" and showed Hall a favorable evaluation Sorrenti had received. Connors inferred from the conversation that Hall "believed that Sergeant Sorrenti was a child molester and homosexual."

In the fall of 2002, Albunio began to hear rumors that she would be removed from the command of the Youth Services Section. She asked for a meeting to discuss this subject with Hall's superior, Deputy Commissioner Frederick Patrick. The meeting took place on October 31, and Hall was present at it with Patrick.

At the October 31 meeting, Patrick confirmed that he and Hall "were contemplating" replacing Albunio, to which she responded: "[W]hy am I losing my command?" Hall interjected to say that Albunio "utilized poor judgment when requesting personnel," citing Sorrenti as the primary example. Albunio told Hall that "Sorrenti was the better candidate," adding: "If I had to do it all again, I would have recommended Sorrenti again." Albunio was told that it would be in her best interest to find another assignment, which she soon did—an assignment much less desirable than the one she left.

Albunio told Connors that she had been directed to go elsewhere. Connors, on November 8, 2002, filed a complaint with the Police Department's Office of Equal Employment Opportunity alleging that Hall had discriminated against Sorrenti because of Sorrenti's perceived sexual orientation. Soon after that, Connors was contacted about the complaint by someone who worked directly for Hall, leading Connors to believe that Hall knew of Connors's accusation. Connors put in for a transfer from the Youth Services Section, believing that with Albunio's forced departure "[t]he writing was on the wall for me." During his remaining time with Youth Services, he suffered a number of adverse employment actions: geographical assignments and hours of work were changed in ways he did not like; and he was shunned and excluded from meetings by Hall and Hall's other subordinates. When his transfer finally came through, he got a less desirable job than he had expected.

Albunio and Connors brought this action against the City, Hall and Patrick, alleging violations of the anti-retaliation section of the New York City Human Rights Law, New York City Administrative Code § 8-107 (7). (Sorrenti also brought a discrimination lawsuit, which was tried with Albunio's and Connors's case, but which is not involved in this appeal.) The jury found that the City and Hall had retaliated against both plaintiffs, and awarded damages. A judgment was entered on the verdict (17 Misc 3d 1102[A], 2007 NY Slip Op 51796[U]), which the Appellate Division affirmed, with one Justice dissenting as to Albunio (67 AD3d 407 [2009]). The Appellate Division granted leave to appeal to this Court, and we now affirm.

## II

New York City Administrative Code § 8-107 (7) says, in relevant part: "It shall be an unlawful discriminatory practice . . . to retaliate or discriminate in any manner against any person because such person has . . . opposed any practice forbidden under this chapter."

The dispositive question on this appeal is whether the record supports the jury's finding that Albunio and Connors "opposed" discrimination against Sorrenti on the basis of Sorrenti's perceived sexual orientation (a practice forbidden by Administrative Code § 8-107 [1] [a]). In answering this question, we must be guided by the Local Civil Rights Restoration Act of 2005 (LCRRA), enacted by the City Council "to clarify the scope of New York City's Human Rights Law," which, the Council found "has been construed too narrowly to ensure protection of the civil rights of all persons covered by the law" (Local Law No. 85 [2005] of City of NY § 1). The LCRRA, among other things, amended Administrative Code § 8-130 to read:

> "The provisions of this title [i.e., the New York City Human Rights Law] shall be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws, including those laws with provisions comparably-worded to provisions of this title, have been so construed."

The application of the LCRRA provision to this case is clear: we must construe Administrative Code § 8-107 (7), like other provisions of the City's Human Rights Law, broadly in favor of discrimination plaintiffs, to the extent that such a construction

is reasonably possible. We interpret the word "opposed" according to this principle, and conclude that the evidence supports a finding that both Albunio and Connors opposed discrimination against Sorrenti.

■ As to Connors, the case is easy. Connors filed a discrimination complaint on Sorrenti's behalf; there is evidence from which the jury could find that Hall knew of the complaint; and, after the complaint was filed, Connors was subjected to a series of adverse employment actions. Indeed, defendants, after arguing that neither Albunio nor Connors engaged in protected activity by advocating Sorrenti's transfer into the Youth Services Section, concede that the filing of Connors's discrimination complaint in November 2002 was protected. Thus, as to Connors, defendants effectively give the case away, making only a perfunctory—and meritless—argument that the jury could not find that the actions taken against Connors were the result of his protected activity, or that they were adverse.

As to Albunio, the case is closer, because she had neither filed a discrimination complaint nor explicitly accused anyone of discrimination before she was ousted as commanding officer of the Youth Services Section. Indeed, we see nothing in the record to support a finding that Albunio "opposed" discrimination before her October 31, 2002 meeting with Hall and Patrick. So far as the record shows, Albunio observed and listened to Hall's mistreatment of, and unfavorable remarks about, Sorrenti, but uttered no word of protest before October 31.

The record might, it is true, support a finding that, before October 31, Hall was displeased with Albunio and decided she should be removed from her command because she had recommended an applicant who Hall thought was gay. We do not suggest that, if that happened, Hall's conduct was either appropriate or legal, but we do not see how it can be called retaliation for opposition to discrimination. There is no evidence that Albunio knew, when she advocated Sorrenti's transfer, either that Sorrenti was or would be perceived as gay or that Hall was prejudiced against gay people. If Albunio was removed for being Sorrenti's advocate, she could perhaps have proved a violation of Administrative Code § 8-107 (20), which prohibits "discrimination against a person because of the actual or perceived . . . sexual orientation . . . of a person with whom such person has a known relationship or association." But Albunio brought no claim under that section of the City Human Rights Law.

■ Since her claim is limited to retaliation, she can prevail only if she shows that she "opposed" discrimination. She did so, if at all, only at the October 31 meeting.* At that meeting, Albunio reacted to Hall's criticism of her recommendation of Sorrenti by telling Hall that Sorrenti was the better candidate for the job and that "[i]f I had to do it all again, I would have recommended Sorrenti again." While she did not say in so many words that Sorrenti was a discrimination victim, a jury could find that both Hall and Albunio knew that he was, and that Albunio made clear her disapproval of that discrimination by communicating to Hall, in substance, that she thought Hall's treatment of Sorrenti was wrong. Bearing in mind the broad reading that we must give to the New York City Human Rights Law, we find that Albunio could be found to have "opposed" the discrimination against Sorrenti at the October 31 meeting.

Accordingly, the order of the Appellate Division, insofar as appealed from, should be affirmed, with costs. The certified question is unnecessary and need not be answered.

Chief Judge LIPPMAN and Judges CIPARICK, GRAFFEO, READ, PIGOTT and JONES concur.

Order, insofar as appealed from, affirmed, etc.

---

* Defendants might argue, but have not argued, that by the time of that meeting the decision to remove Albunio from command had already been made. The parties appear to assume, and we accept the assumption, that the jury could find a causal connection between the October 31 meeting and her removal from command.