WILSON, J. (dissenting).
I agree with my colleagues' conclusion that the Civil Rights Act of 1964 title VII standard for punitive damages does not govern discrimination cases brought under the New York City Human Rights Law (NYCHRL). We part ways, however, on how the New York City Council chose to supplant it. I do not agree that the Council adopted New York's common-law standard, which is not mentioned anywhere in the NYCHRL or its legislative history. Instead, I agree with Ms. Chauca that the *482 **92 City Council amended the NYCHRL to ***335 entitle a plaintiff to a punitive damages charge whenever liability is proved, unless an employer has adopted and fully implemented the antidiscrimination programs, policies, and procedures promulgated by the Commission on Human Rights, as an augmentation to compensatory damages, and would answer the certified question accordingly.
I.
For the better part of a century, New York City has demonstrated its pioneering commitment to human rights through repeated revisions to its Human Rights Law. The City Council's Committee on Civil Rights recently described the NYCHRL as "one of the most expansive and comprehensive human rights laws in the nation" (Report of the Committee on Civil Rights on Local Law 35 of 2016 [2016 Report] ).
In the 1991 revisions, which effected a complete overhaul of that law, the City Council made clear that the NYCHRL not only served an important humanitarian objective, but also was designed to further nearly every traditional governmental purpose. Those revisions reemphasized the New York City Council's earlier finding that there is "no greater danger to the health, morals, safety and welfare of the city and its inhabitants than the existence of groups prejudiced against one another and antagonistic to each other because of their actual or perceived differences, including those based on ... gender" (Administrative Code of City of N.Y. § 8-101 ). The revisions also focused new attention on the scourge of systemic discrimination, which "poses a substantial threat to, and inflicts significant injury upon, the city that is economic, social and moral in character" as well as "distinct from the injury sustained by individuals as an incident of such discrimination" (id. § 8-401). The Council found that systemic discrimination, including systemic employment discrimination, causes economic injury to New York that "severely diminishes its capacity to meet the needs of those persons living and working in, and visiting, the city" (id. ). Moreover, it found that the social and moral consequences "polarize[ ] the city's communities, demoralize[ ] its inhabitants and create[ ] disrespect for the law," thereby frustrating "the city's efforts to foster mutual respect and tolerance among its inhabitants and to promote a safe and secure environment" (id. ).
To better combat those ills, the 1991 revisions supplemented the preexisting administrative enforcement mechanism. Under ***336 prior law, individuals could secure their own redress and prevent further municipal injuries only by bringing a complaint before the City Commission on Human Rights. Under the revised law, both those individuals and the corporation counsel were given the authority to institute a civil action without recourse to the Commission (id. §§ 8-402, 8-502). As relevant here, the NYCHRL now provides that "any person claiming to be ... aggrieved by an unlawful discriminatory practice ... shall have a cause of action in any court of competent jurisdiction for damages, including punitive damages, and for injunctive relief and such other remedies as may be appropriate" (id. § 8-502[a] [emphasis added] ). The hope of then-Mayor Dinkins was that the creation of a private right of action would "supplement the Commission's enforcement efforts and ease a portion of its caseload burden" (Remarks by Mayor David N. Dinkins at Public Hearing on Local Laws, June 18, 1991 at 4 [Dinkins Statement] ). The twin barrels of Commission and private enforcement were both designed to "ensure discrimination plays no role in the public life of the City" (id. at 2). Achieving that goal requires ensuring that "a person can be compensated for the *483 **93 damages she has suffered" and that penalties "exert a strong deterrent effect" against "the harm ... bias does to the social fabric of the city" (id. at 3). In addition to those and other substantive amendments, the 1991 revisions emphasized-without materially amending-the requirement that the NYCHRL must "be construed liberally for the accomplishment of the purposes thereof" (former Administrative Code § 8-130). The accompanying committee report directed our court and others to pay "[p]articular attention" to that obligation and found it "imperative that restrictive interpretations of state or federal ... provisions are not imposed upon city law" (Report of the Committee on General Welfare on Local Law 39 of 1991 [1991 Report] ). Mayor Dinkins repeated that instruction in his signing statement, which implored the judiciary to reject "restrictive state and federal rulings" and to "take seriously the requirement that this law be liberally and independently construed" (Dinkins Statement at 2). Only by following those instructions could the courts give proper force to a human rights law that was, in the words of the mayor who signed it, "the most progressive in the nation" (id. at 1).
Despite clear instructions, courts interpreting the NYCHRL failed to construct it liberally and independently, instead importing narrowing constructions of title VII and the Executive ***337 Law. In the Local Civil Rights Restoration Act of 2005, the City Council informed the courts that they had construed the law "too narrowly to ensure protection of the civil rights of all persons" covered by it (Local Law No. 85 [2005] of City of N.Y. § 1). It repeated that the law must instead be construed "independently from similar or identical provisions of New York state or federal statutes" (id. ). It augmented the construction provision of the NYCHRL, section 8-130, to include that instruction and to further distinguish the law for its "uniquely broad and remedial purposes" (Administrative Code § 8-130). Finally, it amended certain other sections to supersede specific cases that had strayed from those purposes. The clear thrust of the Restoration Act is that courts should interpret the NYCHRL in the manner that best furthers its goals of protecting aggrieved individuals and the social fabric of New York City (see generally Rep. of Comm. on Gen. Welfare, Aug. 17, 2005, 2005 N.Y. City Legis. Ann. at 536 [2005 Report]; Testimony of Craig Gurian, Anti-Discrimination Center of Metro New York, Inc., Regarding Intro 22A [Gurian Testimony] ).
Those reiterated admonishments proved only partially effective. In 2016, finding that only "some judicial decisions ha[d] correctly understood and analyzed the requirement of section 8-130," the Council patiently fired a third salvo in its fight to protect the NYCHRL from being subverted by the courts (Local Law No. 35 [2016] of City of N.Y. § 1). The purpose of that year's revisions was "to provide additional guidance for the development of an independent body of jurisprudence for the New York [C]ity [H]uman [R]ights [L]aw that is maximally protective of civil rights in all circumstances" (id. ). Consistent with that purpose, the Council amended section 8-130 to direct courts toward three decisions that best exemplified the correct approach to interpreting the law: Albunio v. City of New York, 16 N.Y.3d 472, 922 N.Y.S.2d 244, 947 N.E.2d 135 (2011), Bennett v. Health Mgt. Sys., Inc., 92 A.D.3d 29, 936 N.Y.S.2d 112 (1st Dept.2011), and Williams v. New York City Hous. Auth., 61 A.D.3d 62, 872 N.Y.S.2d 27 (1st Dept.2009) ( Administrative Code § 8-130[c] ). Those decisions make clear that, as we stated in Albunio, courts must construe the NYCHRL "broadly in favor of discrimination *484 **94 plaintiffs, to the extent such a construction is reasonably possible" ( 16 N.Y.3d at 477-478, 922 N.Y.S.2d 244, 947 N.E.2d 135 ).
II.
The majority follows that interpretive guideline partway, and I join the portion of its opinion that considers and rejects ***338 Farias and the title VII standard in the context of the New York City Human Rights Law (cf. Farias v. Instructional Sys., Inc., 259 F.3d 91 [2d Cir.2001] ). However, the plain language of section 8-502 and structural features of Administrative Code, title 8, chapter 1, coupled with the legislative history of the title, compel the holding that the standard for finding a defendant liable for punitive damages under the NYCHRL can be borrowed from neither federal jurisprudence nor our common law.[1] Instead, the revised statute provides that a punitive damages charge is automatic on a finding of liability, that those damages must be mitigated if certain factors are established, and can be eliminated entirely by adopting such policies, programs, and procedures as are developed by the Commission on Human Rights. Granted, that construction would make the NYCHRL the most progressive in the nation.
Section 8-502 provides plaintiffs a cause of action "for damages, including punitive damages, and for injunctive relief and such other remedies as may be appropriate, unless such person has filed a complaint with the [Commission or with the State Division of Human Rights]" (Administrative Code § 8-502[a] ). Facially, then, Ms. Chauca and any similarly aggrieved individual is entitled to an award of punitive damages upon a showing of liability. We "construe unambiguous language to give effect to its plain meaning" ( Zakrzewska v. New School, 14 N.Y.3d 469, 479, 902 N.Y.S.2d 838, 928 N.E.2d 1035 [2010] ; see also majority op. at 330, 67 N.Y.S.3d at 88-89, 89 N.E.3d at 478-79 ["The 'starting point in any case of interpretation must always be the language itself, giving effect to the plain meaning thereof' "], quoting Matter of Shannon, 25 N.Y.3d 345, 351, 12 N.Y.S.3d 600, 34 N.E.3d 351 [2015] ).
Here, that plain meaning is further supported by structural features of the NYCHRL. Section 8-107(1) imposes liability directly on employers for their own discriminatory conduct. Section 8-107(13)(b) additionally imposes vicarious liability ***339 for employment discrimination on employers in three instances: where the offending employee exercised managerial or supervisory responsibility, where the employer knew of the offending employee's discriminatory conduct and either acquiesced in such conduct or failed to take immediate and appropriate corrective action, and where the employer should have known of the offending employees' discriminatory conduct and failed to exercise reasonable diligence to prevent it (Administrative Code § 8-107[13][b] [1]-[3] ). *485 **95 In the first two instances, an employer's demonstration of certain factors detailed in subdivision (13)(d) "shall be considered in mitigation of the amount of civil penalties to be imposed by the commission ... or in mitigation of civil penalties or punitive damages which may be imposed pursuant to chapter four or five"; only in the last instance can the demonstration of those factors create an actual shield to liability (id. § 8-107[13][e] ; see also Zakrzewska, 14 N.Y.3d at 479-480, 902 N.Y.S.2d 838, 928 N.E.2d 1035 ). In all instances, were an employer to adopt and implement fully the best practices for preventing and detecting discrimination as promulgated by the Commission, the employer would be immune from punitive damages (Administrative Code § 8-107[13][f] ).[2]
That interrelated set of provisions demonstrates the Council contemplated precisely what the plain language of section 8-502 calls for: automatically charging punitive damages to the jury upon a finding of liability (unless the employer proved the immunity provided by section 8-107[13][f] ), regardless of whether an employer or employee engaged in intentional discrimination or discriminated with malice or reckless indifference to the individual's rights.
Absent an automatic charge, the provisions' assumption that punitive damages are available to be mitigated in any employment discrimination case, but can only be eliminated in a subset of cases, cannot make sense. In addition, using either ***340 the federal or the majority's standard for awarding punitive damages would reduce subdivisions (13)(d), (e), and (f) to mere surplusage. No employer who engaged in discrimination with willful or wanton negligence, or recklessly, or displayed a conscious disregard of the rights of others-the test advocated by the majority-could hope to avail itself of those defenses.
The majority, like the Second Circuit, disputes the relevance of these provisions because, "even if [Ms.] Chauca were correct that the mitigation and avoidance provisions establish the presumption that punitive damages are always available in cases of imputed liability, this would not answer the question of the punitive damages standard for liability based on an employer's own actions" ( Chauca v. Abraham, 841 F.3d 86, 91 n. 3 [2016] ; see also majority op. at 332, 67 N.Y.S.3d at 90, 89 N.E.3d at 480 ["that section applies only to employers' vicarious liability once the punitive damages standard has been met and cannot be read to address the standard itself"] ). The consequence of their argument, however, is that employers would be automatically subject to punitive damages when they are merely vicariously liable for discrimination pursuant to section 8-107(13), but unlikely to face them when directly liable under section 8-107(1). That is, under the majority's interpretation, if an employer had an outright policy of discrimination, punitive damages would be assessed under the higher common-law standard, but if the employer was only vicariously liable for an employee's discriminatory *486 **96 conduct, punitive damages would automatically attach, subject to possible mitigation. That perverse result cannot have been the City Council's intention.
Finally, as reflected in section 8-107(13)(e), the NYCHRL often treats punitive damages under chapter 5 in the same breath as civil penalties under chapter 1. In the latter case, the Commission may "vindicate the public interest" by imposing a considerable fine without first proving the discrimination was "willful, wanton or malicious" (Administrative Code § 8-126 [a] ). If punitive damages are to function as the private cause of action analogue to the Commission's civil penalties, they must be awarded, similarly, without a showing of enhanced culpability.[3] Thus, structural features of the NYCHRL militate in favor of interpreting it to require an automatic ***341 charge. Taken together with the plain meaning of section 8-502, those features make that interpretation more plausible than the majority's.
The interpretation is all the more plausible for accomplishing the purposes of the NYCHRL in a familiar and easily administrable way. The method is familiar because other statutes that, like the NYCHRL, are intended to encourage civil actions by private attorneys general automatically award damages in excess of compensatory damages. For instance, treble damages are automatic under the federal antitrust laws and the Racketeer Influenced and Corrupt Organizations Act, simply on a finding of liability; indeed, intent is not an element of civil violations of the antitrust laws, whereas it is a necessary element of title VII. The method is easily administrable because it forgoes instructing a jury in the niceties of the common-law standard for when punitive damages should be awarded, and instead charges them only with calculating an appropriate amount. The New York Pattern Jury Instructions, which already bifurcate the guidance for determining whether punitive damages should be awarded and the guidance for deciding the amount of the award, contain a list of factors relevant to that calculation. It would be a simple matter to charge each jury, rather than only those that satisfy the majority's test, to consider that list, the specific mitigating factors elaborated in section 8-107(13)(d), and the standard language regarding proportionality to the harm, to compensatory damages, and to the defendant's financial condition.[4] In refusing to countenance the efficacy of this approach, the majority must mean that it disagrees with the policy judgment made by the City Council-that it believes entitling additional successful plaintiffs to awards that exceed their actual damages is a bad idea.
Although the preceding interpretation is in derogation of the "well-established principle of statutory construction that words of technical or special meaning are used by the legislature, 'not ***342 loosely, but with *487 **97 regard for their established legal significance,' " such departures are permitted when "unmistakably intended" (majority op. at 330-331, 67 N.Y.S.3d at 88-89, 89 N.E.3d at 478-79, quoting People v. Wainwright, 237 N.Y. 407, 412, 143 N.E. 236 [1924] ; Wainwright, 237 N.Y. at 412, 143 N.E. 236 ). As the foregoing paragraphs demonstrate, in drafting the NYCHRL, the City Council-whose purpose was the private vindication of both individual and societal human rights-unmistakably intended for "punitive damages" to mean damages any jury may consider awarding in excess of the award required to make a plaintiff whole. Just as the presumption in favor of interpreting "state and local civil rights statutes ... consistently with federal precedent" may yield to section 8-130, so too can our general practice of following the established common-law meaning of a phrase (cf. McGrath v. Toys "R" Us, Inc., 3 N.Y.3d 421, 429, 788 N.Y.S.2d 281, 821 N.E.2d 519 [2004], superseded by statute as stated in Williams, 61 A.D.3d at 74, 872 N.Y.S.2d 27 ).
Alternatively, one could understand the NYCHRL not as departing from the common-law standard for when punitive damages may be awarded, but as making a legislative finding that-in line with the "Restoration Act principle that the discrimination violations are per se 'serious injuries' "-employment discrimination per se satisfies that standard ( Williams, 61 A.D.3d at 77-78, 872 N.Y.S.2d 27 [quoting the 2005 Report's finding that discriminatory acts "cause serious injury, to both the persons directly involved and the social fabric of the City as a whole, which will not be tolerated" (2005 N.Y. City Legis. Ann. at 537) ] ). Home Ins. Co. v. American Home Prods. Corp.'s description of the harms for which punitive damages may be awarded tracks the outrage toward discrimination and its injurious effects on society expressed in sections 8-101 and 8-401 and in the revisions' repeated calls to combat discriminatory conduct with law enforcement-like methods (see e.g. 75 N.Y.2d 196, 203, 551 N.Y.S.2d 481, 550 N.E.2d 930 [1990] [referring to punitive damages as a "hybrid between a display of ethical indignation and the imposition of a criminal fine"] ). All NYCHRL suits are, like punitive damages, "intended not only to 'punish the tortfeasor' but also to 'deter future reprehensible conduct' " (see majority op. at 331, 67 N.Y.S.3d at 89, 89 N.E.3d at 479, quoting Ross v. Louise Wise Servs., Inc., 8 N.Y.3d 478, 489, 836 N.Y.S.2d 509, 868 N.E.2d 189 [2007] ). In drafting section 8-502, the City Council determined juries should have a regular opportunity to consider whether to punish and deter an act that "menace[s] the institutions and foundation of a free democratic state": discriminating against an employee because ***343 of, inter alia, her gender, race, or sexual orientation (Administrative Code § 8-101). It has determined that firing a woman because of her pregnancy is "reprehensible" conduct evidencing "a high degree of moral culpability which manifests a conscious disregard of the rights of others" ( Home Ins. Co., 75 N.Y.2d at 203, 551 N.Y.S.2d 481, 550 N.E.2d 930 [internal quotation marks and citation omitted]; Administrative Code § 8-101). The majority disagrees.
III.
I believe the above interpretation is compelled by the statutory language and the legislative history. Suppose that I am wrong.
As long as the preceding interpretation is even "reasonably possible," it becomes incumbent on the courts to adopt it over the one offered by the majority ( *488 **98 Albunio, 16 N.Y.3d at 477-478, 922 N.Y.S.2d 244, 947 N.E.2d 135 ; see Administrative Code § 8-130[c] ).
As an initial matter, there is no reason to exempt an interpretation imported from our common law from the same scrutiny as one imported from federal or state statutes. Although the 1991 and 2005 revisions had focused on preventing the rote application of statutory law, the three cases cited in the construction provision (as well as the 2016 legislative history, which draws on them at some length) suggest that the City Council sought to free the NYCHRL from the strictures of statutory and decisional law. The 2016 committee report described the most recent revisions as requiring courts to apply the liberal construction provision "in every case and with respect to every issue" and to understand that "legal doctrine might need to be revised to comport with the requirements of § 8-130" (2016 Report at 8-9, 13). "[T]here are no provisions of the law or judge-made doctrines that stand outside the liberal construction requirements" (id. at 10 [emphasis added] ). The cases themselves consider it "beyond dispute that the City HRL now explicitly requires an independent liberal construction in all circumstances " ( Bennett, 92 A.D.3d at 34, 936 N.Y.S.2d 112 [internal quotation marks omitted] ); section 8-130 is intended to "allow independent development of the local law 'in all its dimensions' " ( Williams, 61 A.D.3d at 74, 872 N.Y.S.2d 27, quoting Craig Gurian, ***344 A Return to Eyes on the Prize: Litigating under the Restored New York City Human Rights Law, 33 Fordham Urb. L.J. 255, 280 [2006] [describing the construction provision as "a continuing shield and sword for the City Human Rights Law"] ).[5]
The present case illustrates the merits of the City Council's decision to slip the bonds of the common law. The idea that there is a static common law is an even greater "fallacy" than the idea that there is a "fixed body of 'federal law' " (see Gurian Testimony at 6). The common law may, like the state and federal civil rights laws, be transformed over time. As the discordant parade of increasingly severe cases cited by the majority makes clear, our common-law standard has suffered exactly that fate in the 27 years since Home Ins. (and may now, in many instances, fall below the floor established by title VII) (see majority op. at 331-332, 67 N.Y.S.3d at 89-90, 89 N.E.3d at 479-80; see also Marinaccio v. Town of Clarence, 20 N.Y.3d 506, 964 N.Y.S.2d 69, 986 N.E.2d 903 [2013] ; Dupree v. Giugliano, 20 N.Y.3d 921, 958 N.Y.S.2d 312, 982 N.E.2d 74 [2012] ; Ross, 8 N.Y.3d 478, 836 N.Y.S.2d 509, 868 N.E.2d 189 )-a fact the majority recognizes in walling off its decision from today's punitive damages jurisprudence (majority op. at 334 n. 2, 67 N.Y.S.3d at 91 n. 2, 89 N.E.3d at 481 n. 2).[6] Indeed, any invocation of "the" common- *489 **99 law standard glosses over the reality that our courts' application of punitive damages is "confusing" and "far from uniform," varies-perhaps with good reason-by whether an action sounds in tort or contract, and is, in short, hardly standard (John M. Leventhal & Thomas A. Dickerson, Punitive Damages: Public Wrong or Egregious Conduct? A Survey of New York Law, 76 Alb. L. Rev. 961, 961, 1008 [2013] ). Although the majority employs the version of that standard extant at the time the 1991 revisions introduced punitive damages into the NYCHRL, a better way to protect against the drafters' fear that the law would be "automatically ratcheted down" would be to adopt the reading of it supported in part II (see Gurian Testimony at 3). ***345 That reading is the one that best serves the purpose of the successive revisions to the NYCHRL, which must be construed in the manner most favorable to discrimination plaintiffs (and, thus, to the commonwealth). As we have seen, that purpose is to be "maximally protective of civil rights in all circumstances" by " 'meld[ing] the broadest vision of social justice with the strongest law enforcement deterrent' " (Local Law 35 § 1; 2016 Report at 11, quoting Williams, 61 A.D.3d at 68, 872 N.Y.S.2d 27 ). If, as amici explain, punitive damages are the only effective deterrent because employers carry insurance against compensatory damages and attorney's fees, but cannot obtain it for punitive damages as a matter of New York's public policy, then only by automatically imposing those damages with allowances for mitigating factors and immunity for full compliance with Commission policies can the NYCHRL achieve its "very specific vision" of "no tolerance for discrimination in public life" (2016 Report at 8; Home Ins. Co., 75 N.Y.2d at 200, 551 N.Y.S.2d 481, 550 N.E.2d 930 ).
In fact, the 2005 Restoration Act modeled an amendment to section 8-502 strikingly similar to the one Ms. Chauca proposes today. Rejecting this Court's decision to authorize attorney's fees only in the same narrow circumstances as the federal statute, that act updated the NYCHRL with a bespoke definition of "prevailing" that awarded fees to considerably more plaintiffs and thereby encouraged more rigorous enforcement (see Administrative Code § 8-502[g]; 2005 Report). That update, like all of the substantive 2005 amendments, was meant to "illustrate" desirable changes to the law ( Williams, 61 A.D.3d at 74, 872 N.Y.S.2d 27 ). The expanded construction provision was intended, in the same vein, to "obviat[e] the need for wholesale textual revision of the myriad specific substantive provisions of the law" by the legislature and "accelerate the process by which other doctrines inconsistent with the commands of [the] Restoration Act are abandoned" (2016 Report at 9, 11; 2005 Report). Abandoning not only the title VII but also the common-law standard for punitive damages fulfills that goal as well as the law's express purpose.
Because the mandates of the NYCHRL are as clear as they are uniquely broad and remedial, and because discrimination is "a profound evil that New York City, as a matter of fundamental public policy, seeks to eliminate," I would answer the certified question consistent with this dissent ( Bennett, 92 A.D.3d at 38, 936 N.Y.S.2d 112 ). It would be far better to have the City Council tell us we have gone a bit too far than to have it admonish us a fourth ***346 time for standing in the way of its efforts to end discrimination.
Chief Judge DiFIORE and Judges RIVERA, STEIN, FAHEY and FEINMAN concur; Judge WILSON dissents in an opinion.
**100 *490 Following certification of a question by the United States Court of Appeals for the Second Circuit and acceptance of the question by this Court pursuant to section 500.27 of this Court's Rules of Practice, and after hearing argument by counsel for the parties and consideration of the briefs and the record submitted, certified question answered in accordance with the opinion herein.

The majority chastises Ms. Chauca for relying "almost exclusively on the legislative intent of the NYCHRL and the Restoration Act" (majority op. at 331, 67 N.Y.S.3d at 89, 89 N.E.3d at 479). That mischaracterizes her argument. Even if it did not, the statutory text directs courts to model their NYCHRL analyses on Bennett, which held that
"[w]hile examining the specific language of statutory provisions is part of our inquiry, we must also look to the underlying purpose and the statute's history as we are mindful that in the interpretation of statutes, the spirit and purpose of the act and the objects to be accomplished must be considered. The legislative intent is the great and controlling principle" (92 A.D.3d at 35 n. 2, 936 N.Y.S.2d 112 [internal quotation marks and brackets omitted], quoting Matter of Meegan v. Brown, 16 N.Y.3d 395, 403, 924 N.Y.S.2d 1, 948 N.E.2d 425 [2011] ).

Recognizing the strict aspects of that regime, the City Council noted that the new scheme
"would make the City's law unique among civil rights laws in that the standards are designed not only to deter discriminatory conduct by holding employers accountable but, of equal significance, they are designed to provide employers with an incentive to implement policies and procedures that reduce, and internally resolve, discrimination claims ...
"Employers could mitigate their liability for civil penalties or punitive damages or liability for the act of an employee or agent" (1991 Report, Section-by-Section Analysis at 19-20).

Statements made by one of the law's co-sponsors at its signing indicate chapter 5 was intended to allow private plaintiffs to vindicate the public interest in the absence of robust enforcement by the Commission (Statement by Stanley Michel at Public Hearing on Local Laws, June 18, 1991 [describing the private right of action as "the teeth" of the revisions and "so important in these times when we don't have enough staff and the problems with the budget in getting ... [t]he government to enforce this legislation"] ).

Indeed, juries' and appellate courts' recourse to those standard factors may partially explain the City Council's decision to authorize "punitive" rather treble or some hitherto unknown form of damages. In other words, the City Council drew on the body of law governing the amount of punitive damages, even as it departed from the body governing the standard for awarding those damages in the first place.

Gurian's article, although separate from the legislative history, is an "extensive analysis of the purposes of the Local Civil Rights Restoration Act, written by one of the Act's principal authors" that was used extensively in Williams and has thus been ratified by section 8-130(c) (Williams, 61 A.D.3d at 68 n. 6, 872 N.Y.S.2d 27, quoting Ochei v. Coler/Goldwater Mem. Hosp., 450 F.Supp.2d 275, 283 n. 1 [S.D.N.Y.2006] ).

Although the majority purports to reject the title VII standard for punitive damages in favor of New York's common-law standard, in footnote 2 it cautions: "This holding does not affect the common-law standard for punitive damages in any context beyond the NYCHRL." Unless footnote 2 is, like one's appendix or wisdom teeth, vestigial and purposeless, it must mean that the standard in the majority's opinion is not New York's common-law standard, but something different that the majority does not wish to creep into the common-law standard, and would instead cabin to NYCHRL cases.