OPINION OF THE COURT
Marsha L. Steinhardt, J.
In a case of, what this court perceives to be first impression, plaintiff and medical malpractice defendants (Joan Bryson, CNM; Kristen Leonard, CNM; Community Midwifery, PC) join together to bring a CPLR article 78 proceeding against the Superintendent of the New York State Department of Financial Services and as Administrator of the New York State Medical Indemnity Fund for the arbitrary and capricious denial of infant plaintiff’s admission into the Fund by AliCare, third-party administrator. In sum and substance it is the petitioners’ position that an amended infant compromise order, signed by this court on or about October 15, 2014, and containing the language, “Ordered, that the infant [K.O.] qualifies as an infant who sustained a birth related neurological injury as defined under PHL § 2999 (h)[l]” is binding on the administrator of the fund and that the child’s disqualification for enrollment was ultra vires and without constitutional authority. Respondents maintain that the infant plaintiff is not eligible for enrollment, as the facts and circumstances surrounding his birth preclude same.
In January 2011, in response to New York State’s mounting Medicaid cost crisis, Governor Andrew Cuomo created the Medicaid Redesign Team. The Team was comprised of 25 members, appointed by the Governor, with input from the leaders of both houses of the legislature and “stakeholders” with expertise in areas such as health care delivery, health care insurance, business, etc. In particular the Team was charged with the duty of reviewing and making recommendations regarding the Medicaid program, “which shall include specific cost saving and quality improvement measures for redesigning the Medicaid program to meet specific budget *744 reductions for Medicaid spending.” As part of their “Proposal to Redesign Medicaid” the Team recommended the “creation of a neurologically impaired infant medical indemnity fund . . . that would provide payment for medical expenses of eligible children .... Participation would be mandatory.” Funding would be achieved by a charge on the obstetrical revenues of New York hospitals. The stated purpose of the Fund was “reducing medical malpractice premiums for both physicians and hospitals.” On April 1, 2011 the New York State Medical Indemnity Fund (MIF or Fund) became law (Public Health Law, art 29-D, tit 4, §§ 2999-g—2999-j). It provides the enrollee with access to medical care for life. The “[qualifying health care costs” include “future medical, hospital, surgical, nursing, dental, rehabilitation, custodial, durable medical equipment, home modifications, assistive technology, vehicle modifications, prescription and non-prescription medications, and other health care costs actually incurred for services rendered to and supplies utilized by qualified plaintiffs . . . .” (Public Health Law § 2999-h [3].) The Fund became operational on October 1, 2011.
“The fund applies to medical malpractice actions in which compensation is on behalf of ‘qualified plaintiffs’ (as defined in Pub. Health Law § 2999-h(4)) for ‘birth-related neurological injuries’ (as defined in Pub. Health Law § 2999-h(l)). It provides that all ‘qualifying health care costs’ (as defined in Pub. Health Law § 2999-h(3)) shall be paid by the fund rather than by the defendants, and that the judgment or settlement agreement shall so provide. See Pub. Health Law § 2999-j(6)(13)” (Matthew Gaier & Norman Bard, New York Medical Malpractice § 26:79 [2015]).
A “ ‘[q]ualified plaintiff’ means every plaintiff or claimant who (i) has been found by a jury or court to have sustained a birth-related neurological injury” (Public Health Law § 2999-h [4]) which is previously defined in Public Health Law § 2999-h (1) as
“an injury to the brain or spinal cord of a live infant caused by the deprivation of oxygen or mechanical injury occurring in the course of labor, delivery or resuscitation or by other medical services provided or not provided during delivery *745 admission that rendered the infant with a permanent and substantial motor impairment or with a developmental disability . . .
“The fund shall be administered by the superintendent of financial services [formerly the superintendent of insurance] or his or her designee . . . (Public Health Law § 2999-i [2] [a].) No definition of “delivery admission” is found in the statute. The regulations governing the Fund qualifies it as “a hospital admission for the specific purpose of giving birth.” (10 NYCRR 69-10.1 [h].)
The procedure for enrollment into the Fund is clearly set forth in the statute (Public Health Law § 2999-j [6] [a], [b]) and clarified in the regulations. An application for enrollment shall be submitted on the application form provided by the fund administrator. A copy of the court approved settlement (infant compromise order) and medical records (in addition to numerous other documentation) must be included with the submission. The infant compromise order must contain language that the plaintiff or claimant has been deemed or found to have sustained a birth-related neurological injury (defined above) and that in the event the plaintiff is enrolled into the Fund all future medical expenses are to be paid by it. A further provision regarding the eventuality of nonacceptance into the Fund is contained in the compromise order as well.
An action sounding in medical malpractice was commenced in 2011 by Tamara Petrovic and Garner Oh, as parents and natural guardians, on behalf of their infant son, K.O., for injuries allegedly sustained by him at birth on xx/xx/xxxx. It is undisputed that the child was delivered at home and rushed to the hospital sometime after birth. The fact that K.O. sustained neurological injuries during the birth process is also not contested by the parties to the instant applications before the court. The underlying lawsuit took its usual course and was settled before the undersigned in July 2014. The total amount of the settlement was $3,065,899.17, said sum representing both “Fund” and “non-Fund” compensation. The defendants were required to pay (in “real” or “actual” dollars) a total amount of $1,226,359.67, which included proportionate attorneys’ fees. An infant compromise order, reflecting the terms of the settlement and the language required for enrollment into the Fund was signed on or about October 14, 2014. An ap *746 plication was submitted by plaintiffs to the fund administrator sometime thereafter and on or about November 20, 2014 plaintiffs’ attorney was notified that the child was deemed to not qualify for enrollment in that “the infant plaintiff was delivered at home . . . . As such, the injury to plaintiff was not sustained in the course of a ‘hospital admission,’ as required by the regulation in order to constitute a ‘qualified plaintiff.’ ”
Plaintiffs and defendants to the original lawsuit (petitioners) contend, in their joint application, that the determination by the court regarding the eligibility of the child for enrollment in the Fund is binding upon the administrator. They further argue that the role of the administrator is to determine that the appropriate paper work accompanies the application and that substantive decisions regarding eligibility are left to the judiciary. Respondents, on the other hand, argue that the facts and circumstances surrounding the birth of the infant plaintiff (home, as compared to hospital delivery) preclude enrollment into the Fund.
“Midwives are governed by Article 140 of the Education Law, which defines midwifery as ‘the management of normal pregnancies, child birth and postpartum care as well as primary preventive reproductive health care of essentially healthy women, and shall include newborn evaluation, resuscitation and referral for infants.’ ” (Thomas A. Moore & Matthew Gaier, Physician Liability From Collaborative Arrangements, NYLJ, Oct. 6, 2015 at 3, col 1, 3.)
“Home births have been around as long as humans, but since the 1950s, the overwhelming majority of American women have chosen to give birth in hospitals, which the American College of Obstetricians and Gynecologists identifies as one of the safest places for the unpredictable and sometimes dangerous process of childbirth. (The group has officially opposed home births since 1975, and this year [2008] the American Medical Association adopted a similar position.) . . .
“Births in New York’s hospitals, where pediatricians are able to check babies immediately for potentially dangerous conditions, it should be noted, still vastly outnumber those in its homes—in 2006 home births accounted for only one-half of 1 *747 percent of the city’s 125,506 reported births . . .
“ Tn a home, even with a quality provider, you don’t have access to surgeries or blood transfusions or lifesaving medications you would have in a hospital’ . . . ‘The literature does say the majority of normal deliveries can be done at home. But I think, and others think, the stakes are too high.’ [Dr. Erin Tracy, obstetrician and public health expert, Massachusetts General Hospital] . . .
“ ‘The A.M.A. supports a woman’s right to make an informed decision regarding her delivery and to choose a licensed health care provider’ and ‘stresses that the safest setting for delivering a baby is in the hospital or a birthing center within a hospital complex,’ Dr. Steven Stack, a board member, said . . . ‘Serious complications can arise with little or no warning even among women with low-risk pregnancies.’ ” (Julie Scelfo, Baby, You’re Home, NY Times, Nov. 13, 2008, § D at 1, 9.)
“[T]he proportion of pregnant women who choose to give birth at home in the United States is still very small—about 1 percent.” (The Opinion Pages, Room for Debate, Is Home Birth Ever a Safe Choice?, NY Times, Feb. 24, 2015, available at http://www.nytimes.com/roomfordebate/2015/02/24/is-homebirth-ever-a-safe-choice.) Complications arise approximately 11% of the time in home delivery. (Marinah Valenzuela Farrell, president of the Midwives Alliance of North America, The Opinion Pages, Room for Debate, Is Home Birth Ever a Safe Choice?, NY Times, Feb. 24, 2015, available at http:// www.nytimes.com/roomfordebate/2015/02/24/is-home-birthever-a-safe-choice/hospitals-carry-their-own-risks.) Frequently, when complications arise the mother is transferred to a hospital for access to additional technology. The planned for home birth then takes place in a hospital setting.
The purpose of the Public Health Law is clearly set forth within the four corners of the statute—“to provide a funding source for future health care costs associated with birth related neurological injuries, in order to reduce premium costs for medical malpractice insurance coverage.” (Public Health Law § 2999-g.) Nowhere is the venue of birth mentioned. The first and only time that the phrase “delivery admission” is found occurs in the section defining “birth related neurological *748 injury.” A study of the legislative history surrounding Public Health Law § 2999-g et seq. fails to reveal any reference to the place of birth. The statute was intended to save money, i.e., to keep the cost of payments for future medical treatment down and to remove the financial burden of caring for neurologically (and in the vast majority of the cases, catastrophically) injured infants from Medicaid. It is the opinion of the undersigned that during the course of research into and debate surrounding Public Health Law §§ 2999-g through 2999-j no one had a concern as to where the mother gave birth. The focus was the delivery of a neurologically impaired child. Not where the delivery of the child took place. The court cannot fathom that it was the intent of either the legislature or Governor Cuomo to exclude from enrollment into the fund such a minuscule number of plaintiffs (11% of 1% of all births). The choice by his parents of the delivery venue should not penalize the infant and deprive him of legally authorized services for the rest of his life. In fact, this court is of the opinion that the legislature should revisit Public Health Law §§ 2999-g through 2999-j and omit the word “admission.” The litigation concerning Fund enrollment that surrounds this case would thereby be resolved for future, otherwise Fund eligible infants.
“The regulations promulgated on the MIF by the New York State Department of Health (DOH) . . . anticipate that the court will determine whether settled cases meet the statutory criteria for inclusion in the Fund . . . Thus, the regulations and administrative procedure presume that the court will make a finding on . . . determining which cases shall be placed in the Fund.” (Joyner-Pack v State of New York, 38 Misc 3d 903, 909-910 [Ct Cl 2012].)
As this court has previously determined that K.O. qualifies for enrollment into the Fund and for all of the reasons set forth above it is the opinion, decision and order of the undersigned that AliCare, as third-party administrator of the Medical Indemnity Fund, acted arbitrarily when denying said infant enrollment into same. In the interests of justice the child shall be deemed to be admitted. Equally, in the interests of justice, Emily Prober, a functionary at the Fund, and signor of the letter rejecting K.O., shall be deleted from the caption and amended as follows:
*749 -X
In the Matter of Index No. 500899/2015
the Application of K.O.,
an Infant by his parents and Natural Guardians GARNER OH and TAMARA PETROVIC,
Plaintiff-Petitioners
For a Judgment Under Article 78 of the CPLR
- against -
BENJAMIN M. LAWSKY in his Official capacity as Superintendent of the New York State Department of Financial Services and as Administrator of the NEW YORK STATE MEDICAL INDEMNITY FUND and AliCare, Third Party Administrator of the NEW YORK STATE MEDICAL INDEMNITY FUND,
— Defendant-Respondent
-X