OPINION OF THE COURT
Marsha L. Steinhardt, J.
K.I., by her parents and natural guardians, petitions this court pursuant to article 78 of the CPLR for an order declaring the determination of AliCare, the third-party administrator of the Medical Indemnity Fund, arbitrary, capricious, invalid and unenforceable, and directing and compelling respondents to accept the infant petitioner for enrollment to the Fund. Respondent, Superintendent of the New York State Department of Financial Services (DFS), cross-moves to dismiss the article 78 petition pursuant to CPLR 7804 and 3211 (a) (7). Thereafter, DFS filed a separate motion for an order deeming DFS’s cross motion unopposed and dismissing infant’s petition. Respondents, Emily Prober and AliCare, filed a motion seeking the same relief. Petitioners submitted opposition to the motions and cross motion and an affirmation in further support of their article 78 petition.
Petitioners challenge herein the determination of the administrator of the Fund denying K.I.’s application, pursuant to Public Health Law § 2999-j (7), for enrollment to the Fund. The rejection is based on the administrator’s determination that the malpractice occurred prior to labor, thus concluding that the infant is exempt from the provisions and privileges of the Fund.
The infant plaintiff was born on December 12, 2008 by emergency C-section at Maimonides Medical Center. Plaintiff claims in the bill of particulars, responsive to the demands of defend *246 ant Maimonides Medical Center, that the hospital failed to perform a C-section in a timely manner, failed to properly train and instruct their medical personnel, failed to recognize and diagnose placental abruption, failed to recognize Ms. Azam’s underlying conditions placing her at risk for placental abruption, failed to timely admit her to the hospital and failed to properly treat Ms. Azam prior to the onset of labor. As against the defendant physician Dr. Hafeez plaintiff alleges the physician failed to properly diagnose placental abruption, failed to diagnose Ms. Azam’s risk for placental abruption, failed to timely refer her to specialists, and failed to timely perform a C-section. Plaintiff claims that as a result of these and other departures, the infant sustained brain damage as a result of hypoxic-ischemic encephalopathy. It is claimed that the infant suffers from an intractable seizure disorder, spastic quadriplegia, hypotonia, and impaired language skills, requires a tracheostomy, requires a gastrostomy tube, required fundopli-cation surgery, has cortical blindness, has absent motor and language development and suffers from other neurological disabilities. The infant is eight years old, has no head control and needs full support to be placed in, and maintain, a sitting position.
The action was litigated for many years and numerous settlement conferences were had before the undersigned. All sides negotiated for their respective interests and a settlement was reached in late 2015. In the order of compromise, signed on January 7, 2016, this court determined that the provisions of Public Health Law § 2999-g et seq. were met and that the infant sustained a birth-related neurological injury and is thereby a qualified infant entitled to enrollment in the Fund.
Submitted in support of petitioner’s position is an affirmation by Daniel Adler, M.D., a pediatric neurologist, who reviewed the infant’s medical records and performed a physical examination of the child. The expert notes that the infant was born via C-section when the mother encountered a placental abruption. Dr. Adler’s clinical impression is that the child sustained hypoxic-ischemic encephalopathy suffered at or around the time of birth. These conditions are permanent. The neurologist affirms that according to published data, the infant has a 58% probability of living to 15 years of life and if she lives to age 15 she may have an additional life expectancy of 14 years.
Procedural issues have been raised by respondents as to the timing of this application. Public Health Law § 2999-j (7) (a), *247 effective February 14, 2017, provides that a request for a review of a determination by the Fund administrator that the relevant provisions of Public Health Law § 2999-j (6) have not been met and/or that the plaintiff is not a qualified plaintiff may be made by any of the parties, no later than 60 days from receipt of the denial. The application is to be made to the court wherein the judgment was awarded or the case was settled. As no party has been prejudiced by adjournments by any party to this application, the court, in the interests of justice and in its discretion, accepts all papers submitted in relation to this petition and deems the submissions timely.
The central issue in this application arises out of the Fund administrator’s denial to enroll the infant into the Fund based upon a determination that this case falls outside the provisions of the statute. Respondents claim that the acceptance criteria have not been met because the alleged malpractice (the medical departure) was not birth-related and did not take place in the course of labor or delivery.
As the legal issue presented in this petition is one of first impression, a review of the relevant provisions of the Public Health Law is warranted. Since “the clearest indicator of legislative intent is the statutory text, the starting point in any case of interpretation must always be the language itself, giving effect to the plain meaning thereof.” (Majewski v Broadalbin-Perth Cent. School Dist., 91 NY2d 577, 583 [1998]; Matter of Shannon, 25 NY3d 345, 351 [2015]; see Consedine v Portville Cent. School Dist., 12 NY3d 286, 290 [2009].) “It is fundamental that a court, in interpreting a statute, should attempt to effectuate the intent of the Legislature.” (Majewski v Broadalbin-Perth Cent. School Dist. at 583; Matter of Shannon at 351; see Patrolmen’s Benevolent Assn. of City of N.Y. v City of New York, 41 NY2d 205, 208 [1976].)
The Medical Indemnity Fund was created on April 1, 2011 by the New York State Legislature to provide a “funding source for future health care costs associated with birth related neurological injuries, in order to reduce premium costs for medical malpractice insurance coverage.” (Public Health Law § 2999-g.) A “qualified plaintiff” means every plaintiff or claimant who (i) has been found by a jury or court to have sustained a birth-related neurological injury as the result of medical malpractice, or (ii) has sustained a birth-related neurological injury as the result of alleged medical malpractice, and has settled his or her lawsuit or claim therefor. (Public Health Law § 2999-h [4].) A
*248 “ £[b]irth-related neurological injury’ means an injury to the brain or spinal cord of a live infant caused by the deprivation of oxygen or mechanical injury occurring in the course of labor, delivery or resuscitation, or by other medical services provided or not provided during delivery admission, that rendered the infant with a permanent and substantial motor impairment or with a developmental disability as that term is defined by section 1.03 of the Mental Hygiene Law, or both. This definition shall apply to live births only.” (Public Health Law § 2999-h [1].)
In 2017 the legislature made certain changes to the law. In so doing, the Assembly noted in its legislative memorandum that
“[t]he Medical Indemnity Fund (MIF) was designed to ensure that children with birth-related neurological injuries are able to have their medical needs met, and access services that they need to improve their quality of life. In furtherance of that goal, the bill that created chapter 517 of the laws of 2016 as well this bill make changes to the MIF to allow children to better access such services.” (Assembly Mem in Support, L 2017, ch 4, 2017 McKinney’s Session Law News of NY, No. 1 at A-20 [Apr. 2017].)
In its legislative memorandum, the New York State Senate set forth reasons underlying the expansion of the statute. In relevant part it states,
“[t]he Fund has been in operation for more than four years, and the experiences of the parents of children who are required to rely on the Fund in lieu of direct compensation for their medical and health care expenses have exposed issues with the administration of the Fund . . . The children and the families of children who have sustained birth-related neurological injuries due to malpractice deserve to have their future health care costs and services they need paid for by the Fund they are required to participate in.” (Senate Mem in Support, L 2016, ch 517, 2016 McKinney’s Session Law News of NY, No. 8 at A-632 [Feb. 2017].)
The memorandum further notes that “[t]he provisions of this bill will work to remedy current flaw in the Fund and ensure it functions as originally intended.” (Id.)
*249 In light of these considerations, substantive and technical changes became effective on February 14, 2017. The technical change pertinent to this discussion was the seemingly minor insertion of commas to the section that defines a “birth-related neurological injury.” In its previous edition, the definition of birth-related neurological injury was
“an injury to the brain or spinal cord of a live infant caused by the deprivation of oxygen or mechanical injury occurring in the course of labor, delivery or resuscitation or by other medical services provided or not provided during delivery admission that rendered the infant with a permanent and substantial motor impairment or with a developmental disability.” (Public Health Law § 2999-h [former (1)] [prior version eff Apr. 1, 2011 to Feb. 13, 2017].)
The new version states:
“ ‘Birth-related neurological injury’ means an injury to the brain or spinal cord of a live infant caused by the deprivation of oxygen or mechanical injury occurring in the course of labor, delivery or resuscitation, or by other medical services provided or not provided during delivery admission, that rendered the infant with a permanent and substantial motor impairment or with a developmental disability.” (Public Health Law § 2999-h [1] [eff Feb. 14, 2017] [emphasis added].)
By adding the comma after “resuscitation,” the definition of “birth-related neurological injury” is expanded. The criteria are that the injury take place during labor, or during delivery, or during resuscitation, or, the injury may include those occurring during the delivery admission as set forth in the section. Indeed, the memorandum in support of these changes notes that
“[s]ection 3 of this bill also makes technical amendments regarding eligibility for the Fund to address issues raised in Matter of K.O. v Lawsky, 50 Misc 3d 742, in which the Fund found the plaintiff not qualified despite a Judge’s finding to the contrary, based on the fact that the infant was not admitted [to a hospital] at the time of the injury. While the Court found that the Fund acted arbitrarily in denying enrollment, these changes would clarify the intent of this provision.” (Senate Mem in Support, L 2016, ch 217, 2016 McKinney’s Session Law *250 News of NY, No. 8 at A-632 [Feb. 2017] [2016 NY Senate Bill S7873B, Sponsor: Hannon].)
It is crucial to this determination to note that in reviewing the legislative history and in considering the plain meaning of the relevant statutes, the court finds that there is no requirement that the alleged malpractice take place precisely at the time of birth. The plain meaning of the statutory language clearly indicates that the pertinent provision of the Public Health Law requires that the injury take place in the course of labor, at the time of birth, or during the birth admission. The statute does not condition admission to the Fund upon the timing of the medical departure. Rather the requirement is that the injury be caused by the deprivation of oxygen or mechanical injury occurring in the course of labor, delivery or resuscitation. (Public Health Law § 2999-h [1].) Nowhere in the relevant sections is there a provision requiring that the medical departure from the standard of care occur at the time of birth or during the birth admission. The determinative factor is that the injury occurs during the labor, delivery or resuscitation.
Respondents’ argument that the infant was injured during the “prenatal” stage of pregnancy is not only spurious, but also, misplaced. This claim goes against the common understanding of “labor.” The National Institutes of Health of the United States Department of Health and Human Services defines “labor” as
“the process by which the fetus and the placenta leave the uterus. Delivery can occur in two ways, vaginally or by a cesarean delivery.
“Labor occurs in three stages and can actually begin weeks before a woman delivers her infant. The first stage begins with the woman’s first contractions and continues until she is dilated fully (10 centimeters, or 4 inches), which means the cervix has stretched to prepare for birth. The second stage is the active stage, in which the pregnant woman begins to push downward. It begins with complete dilation of the cervix and ends with the actual birth. The third stage, or placental stage, begins with the birth and ends with the completed delivery of the placenta and afterbirth.” (Dept of Health and Human Services, Health & Research, What is labor?, https:// www.nichd.nih.gov/health/topics/pregnancy/ conditioninfo/Pages/labor.aspx [accessed July 27, *251 2012]; Office on Women’s Health, US Dept of Health and Human Services, Labor and birth, http://www.womenshealth.gov/pregnancy/ childbirth-beyond/labor-birth.html.)
In short, labor is not stagnant but fluid. Respondents’ attempt to artificially compartmentalize the sequence of events in this case and categorize the mother’s vaginal bleeding as a prenatal event is a flawed argument. The assumption that the mother was in the prenatal stage when the injury occurred to the infant has no medical foundation. This infant was born merely hours after the mother began to experience vaginal bleeding. Respondents’ claim is askew of the facts and this argument goes far beyond what the legislature intended in enacting the statutes and in the revisions that became effective this year.
Respondents also claim that the infant’s mother, a layperson, “admits” that the alleged injury did not occur in the course of labor. Respondents rely on Ms. Azam’s affidavit stating that “I was told that I was suffering a placental abruption and I was rushed into a delivery room and a C-section was performed within 20 minutes . . . We were informed that my daughter suffered Hypoxic Ischemic Encephalopathy prior to her delivery.”
The court rejects the use of the mother’s affidavit as a basis to deny the infant admission into the Fund. At the onset and as noted above, the mother is not a medical professional and is incapable of making a determination as to the medical claims in this case or of rendering an opinion as to the timing of the hypoxic brain injury. Indeed, while the mother’s affidavit states that the infant’s hypoxia occurred “prior” to delivery, the hospital record for the delivery admission disputes this indicating that “[t]he mother is a 31-year-old, G2P1 woman. Her pregnancy was complicated by: presumed placental abruption. Mom was brought to Maimonides by EMS with vaginal bleeding. Fetal bradycardia was present on the fetal heart monitor. Mom had stat CSxn (Cesarean section) for presumed placental abruption.” (Emphasis added.) Thus, according to the hospital record, the placental abruption was not confirmed but rather, presumed, at the time the cesarean section was ordered. Clearly, Ms. Azam is not an expert and is without the requisite expert qualifications to opine on the medicine in this case.
This statement also serves no evidentiary purpose because of the context in which the mother provided the affidavit. In a petition to compromise a medical malpractice case involving an *252 infant, an affidavit of a parent or guardian is submitted in support of the settlement. The quality and substance of such affidavit is clearly aimed to convince the court of the soundness of the amount of the settlement. The court’s task on a petition for approval of an infant’s settlement is to evaluate the fairness and reasonableness of the settlement. The Second Department notes that a court is aided in this endeavor by a supporting affidavit by an infant’s representative; a supporting affidavit of attorney, if any; medical or hospital reports if the claim is for personal injuries; and appearance by infant, representative and attorney. (Edionwe v Hussain, 7 AD3d 751, 753 [2d Dept 2004]; see CPLR 1207, 1208.) The court must scrutinize the settlement to assure that it is fair and reasonable and in the infant plaintiff’s best interests. (Valdimer v Mount Vernon Hebrew Camps, 9 NY2d 21 [1961]; CPLR 1207.) To take the affidavit of the mother that was intended as a tool for the court and convert it into a sword, cutting the infant out of the Fund, is simply wrong.
Lastly, Ms. Azam’s statements as to both the malpractice and the timing of the infant’s hypoxic injury are clearly based on something that someone else said. For all we know, it could have been made by another layperson. Had she attempted to make that statement at trial, she would have been precluded by a hearsay objection.
Accordingly, having considered legislative intent, not only in enacting Public Health Law § 2999 (g)-(j) in 2011 but also in expanding the scope of the Fund earlier this year, and upon the foregoing discussion, the court finds that this infant sustained birth-related neurological injury and that the hypoxic-ischemic encephalopathy injury occurred “in the course of labor” as required by the statute. K.I. is an intended beneficiary of the provisions of the Medical Indemnity Fund. Petitioner’s application is granted and the infant is accepted in the Fund.