=================================================================
This opinion is uncorrected and subject to revision before
publication in the New York Reports.
-----------------------------------------------------------------
No. 80
In the Matter of Edna Shannon,
&c.

Family Service Society of
Yonkers,
            Petitioner,
        v.
Westchester County Department of
Social Services,
            Appellant,
Eastchester Rehabilitation &
Health Center,
            Respondent.


        Eileen Campbell O'Brien, for appellant.
        Sarah C. Lichtenstein, for respondent.


FAHEY, J.:

    On this appeal we are called upon to determine whether

Mental Hygiene Law § 81.44 permits a guardian to retain property

of an incapacitated person after the incapacitated person has

died for the purpose of paying a claim against the incapacitated

person that arose before such person's death.  We conclude that

- 1 -

it does not.

                                    I.

     Respondent Eastchester Rehabilitation & Health Care Center
(Eastchester), a skilled nursing facility, began to care for Edna
Shannon in December 2005.  Approximately three years later,
respondent Westchester County Department of Social Services (DSS)
determined that Shannon was eligible for Medicaid benefits as of
September 1, 2008.  In April 2009, and pursuant to Eastchester's
request, Supreme Court appointed petitioner, Family Service
Society of Yonkers (FSS Yonkers), as guardian of Shannon's person
and property.  Shannon was discharged from Eastchester to another
skilled nursing facility in November 2009.

     In June 2010, Eastchester made a claim with FSS Yonkers
seeking compensation for approximately $164,000 in services it
rendered to Shannon that were not covered by Medicaid.  Some
three months later, DSS advised FSS Yonkers that Shannon was
indebted to DSS in the approximate amount of $166,000 for medical
assistance paid on her behalf.  Supreme Court approved the sale
of Shannon's real property for $308,000 in January 2011, and
Shannon died at age 87 in December 2011.  In the meantime,
Shannon's debts to Eastchester and DSS had grown such that by
summer 2012 more than $200,000 was owed to each of those
entities.  By then, slightly less than $190,000 of Shannon's
property remained.  The question whether that property, which
consisted of cash and securities, remained in Shannon's

guardianship account or became the property of her estate lies at the core of this appeal.

In August 2012 FSS Yonkers commenced this proceeding to settle its final account as to the guardianship seeking a determination whether it was required to pay Shannon's remaining property in equal amounts to DSS and Eastchester in satisfaction of their claims, or whether it should disburse the property in some other manner.  By order entered in February 2013, Supreme Court held that the balance of Shannon's remaining property (save for $9,000 that the court instructed FSS Yonkers to pay to its attorneys and to the court examiner for services rendered in connection with the guardianship estate) should be paid to DSS in satisfaction of DSS's claim (see Social Services Law § 369 [2] [b] [i] [B] [permitting recovery for medical assistance correctly paid "from the estate of an individual who was (55) years of age or older when he or she received such assistance," subject to certain qualifications immaterial here]).  On appeal, the Appellate Division reversed insofar as appealed from, with the majority holding "that since Eastchester's claim arose before Shannon's death, and [Mental Hygiene Law §] 81.44 (d) allows [FSS Yonkers] to retain assets to secure known claims, Eastchester's claim has priority over that of DSS, which arose after Shannon's death" (120 AD3d 128, 129 [1st Dept 2014]).

The dissenter, however, "would [have] affirm[ed] Supreme Court's determination that the Medicaid lien imposed by Social

Services Law § 104 (1) takes precedence over a claim by the general creditor, . . . Eastchester" (id. at 133-134 [Freedman, J., dissenting]). The dissenter concluded that "[o]nce . . . Shannon died, all funds other than those reserved for the administration of her guardianship in accordance with Mental Hygiene Law § 81.44 passed to her estate" (id. at 134), and that DSS thus had a claim superior to that of Eastchester against Shannon's property (see id. at 136, citing Social Services Law § 104 [1]). We subsequently granted DSS leave to appeal (24 NY3d 904, 905 [2014]) and, for the reasons that follow, we now reverse the order of the Appellate Division insofar as appealed from.[1]

II.

The Medicaid program is designed "to pay for necessary medical care for those eligible individuals whose income and resources do not allow them to meet the costs of their medical needs" (Matter of Golf v New York State Dept. of Social Servs., 91 NY2d 656, 659 [1998]). Ultimately, the "goal of Medicaid [is]

_____

[1] The aforementioned order of Supreme Court was not the only order of that court at issue in this appellate practice. Indeed, Eastchester moved before Supreme Court for leave to reargue the order of that court entered in February 2013. The court denied that motion, and Eastchester also appealed to the Appellate Division from the order denying reargument (see 120 AD3d at 133). The Appellate Division subsequently dismissed that appeal (see 120 AD3d at 133), and we eventually treated DSS's motion for leave to appeal to this Court as one seeking leave to appeal from only that part of the Appellate Division order that reversed the order of Supreme Court entered in February 2013. As such, neither the order of Supreme Court denying reargument nor the Appellate Division's dismissal of the appeal therefrom is of consequence here.

that the program be the payer of last resort" (Matter of Costello
v Geiser, 85 NY2d 103, 106 [1995] [internal quotation marks
omitted]).  Apparently with that in mind, the Legislature enacted
what is now Social Services Law § 104 (1), which provides, in
relevant part, that "[i]n all claims of the public welfare
official made under [such] section the public welfare official
shall be deemed a preferred creditor."

Given the pertinent language of Social Services Law § 104
(1), to the extent that both DSS and Eastchester seek to recover
from Shannon's estate, DSS's claim against property that passed
to the estate would have priority over a competing claim brought
by Eastchester because Eastchester did not take a judgment
against Shannon before she died.  Indeed, absent a judgment,
Eastchester would be a general creditor, that is, "[a] creditor
[that], upon giving credit, takes no rights against specific
property of the debtor" (Black's Law Dictionary 449, 450 [10th ed
2014]), and, in theory, a claim it made against property in
Shannon's estate would be subservient to any claim of DSS against
such property.  However, this appeal does not present a question
of competing claims against property in Shannon's estate.
Rather, the issue is whether property held by FSS Yonkers as
Shannon's guardian at the time of Shannon's death automatically
became the property of her estate or could be withheld by FSS
Yonkers for the purpose of paying the claim, out of the
guardianship account, that Eastchester had noticed before Shannon

died.

As the dissenter at the Appellate Division noted, FSS Yonkers's authority as Shannon's guardian expired with Shannon's death (see 120 AD3d at 136 [Freedman, J., dissenting], citing Mental Hygiene Law § 81.36 [a] [3] [providing that "(t)he court appointing the guardian shall discharge such guardian, or modify the powers of the guardian where appropriate, if it appears to the satisfaction of the court that . . . the incapacitated person has died"]), and the property in the guardianship account that remained after the fees of the guardianship were paid would normally have passed to her estate (see Surrogate's Court Procedure Act § 103 [19] [defining "estate" as "(a)ll of the property of a decedent . . . or person for whom a guardian has been appointed . . . ."]). The question becomes whether, as the Appellate Division majority concluded, Mental Hygiene Law § 81.44 (d) provides for what amounts to a holdback authorizing "Eastchester . . . to be paid out of the guardianship account [maintained by FSS Yonkers for Shannon] before any funds passed to [Shannon's] estate" (120 AD3d at 131), i.e., whether FSS Yonkers may withhold from Shannon's estate funds in the guardianship account for the purpose of paying Eastchester. The text of section 81.44 (d) provides that:

> "Within [150] days of the death of the
> incapacitated person, the guardian shall
> serve upon the personal representative of the
> decedent's estate or where there is no
> personal representative, upon the public
> administrator or chief fiscal officer, a

statement of assets and notice of claim, and, *except for property retained to secure any known claim, lien or administrative costs of the guardianship pursuant to subdivision (e) of this section*, shall deliver all guardianship property to:

"1. the duly appointed personal representative of the deceased incapacitated person's estate, or

"2. the public administrator or chief fiscal officer given notice of the filing of the statement of death, where there is no personal representative. . . ." (emphasis added).

Subdivision (e) of section 81.44, in turn, states that,

"[u]nless otherwise ordered by the court . . ., *the guardian may retain*, pending the settlement of the guardian's final account, guardianship property equal in value to the claim for *administrative costs, liens and debts*"(emphasis added).

## III.

"It is fundamental that a court, in interpreting a statute, should attempt to effectuate the intent of the Legislature" (Majewski v Broadalbin-Perth Cent. School Dist., 91 NY2d 577, 583 [1998] [internal quotation marks omitted]; see Matter of Albany Law School v New York State Off. of Mental Retardation & Dev. Disabilities, 19 NY3d 106, 120 [2012]).  Inasmuch "[a]s the clearest indicator of legislative intent is the statutory text, the starting point in any case of interpretation must always be the language itself, giving effect to the plain meaning thereof" (Majewski, 91 NY2d at 583; see Commonwealth of the N. Mariana Is.

v Canadian Imperial Bank of Commerce, 21 NY3d 55, 60 [2013]).

"We are also guided in our analysis by the familiar principle

'that a statute . . . must be construed as a whole and that its

various sections must be considered together and with reference

to each other' " (Matter of New York County Lawyers' Assn. v

Bloomberg, 19 NY3d 712, 721 [2012], rearg denied 20 NY3d 983

[2012], quoting People v Mobil Oil Corp., 48 NY2d 192, 199

[1979]; see Albany Law School, 19 NY3d at 120).  Of course,

"where 'the language is ambiguous, we may examine the statute's

legislative history' " (People v Ballman, 15 NY3d 68, 72 [2010],

quoting Roberts v Tishman Speyer Props., L.P., 13 NY3d 270, 286

[2009]).

This is one of those instances in which the statutory

language is unclear.  In reciting in Mental Hygiene Law § 81.44

(d) the purposes for which a guardian may retain the property of

an incapacitated person following such person's death, the

Legislature listed the security of "claim[s]" and "lien[s]"

before reaching "administrative costs."  If our analysis was

limited to the examination of subdivision (d), a reasonable mind

could conceivably side with Eastchester.  Indeed, had the

Legislature meant in that subdivision to permit the retention of

property needed to secure only *administrative* claims and

*administrative* liens, it would have said as much.  Stated

differently, the Legislature could have placed the modifier

"administrative" next to the nouns "lien" and "claim,"; that is,

it could have explicitly provided for the retention of property
for the narrow purpose of satisfying *administrative* liens and
*administrative* claims (<u>see</u> <u>Matter of Raynor v Landmark Chrysler</u>,
18 NY3d 48, 56 [2011] ["(w)here a statute describes the
particular situations in which it is to apply and no qualifying
exception is added, an irrefutable inference must be drawn that
what is omitted or not included was intended to be omitted or
excluded"] [internal quotation marks omitted]; <u>cf.</u> Mental Hygiene
Law § 81.21 [a] [19] [empowering a guardian to "pay bills after
the death of the incapacitated person provided the authority
existed to pay such bills prior to death until a temporary
administrator or executor is appointed"]).  Viewed in isolation,
the fact that the Legislature did not insert such a limitation
into subdivision (d) could suggest that it meant to allow the
retention of guardianship funds to secure *administrative* costs,
as well as *any* claim or *any* lien.

Our review, however, is not that constrained.  The plain
language of subdivision (d) of Mental Hygiene Law § 81.44
requires that it is to be read in conjunction with subdivision
(e) of the same section, which considers the property a guardian
may retain following the death of an incapacitated person.
Further, our precedent requires such a review (<u>see</u> <u>New York</u>
<u>County Lawyers' Assn.</u>, 19 NY3d at 721).  In subdivision (e) of
section 81.44, the Legislature allowed a guardian to retain from
the estate of a deceased incapacitated person "property equal in

value to the claim for *administrative* costs, liens and debts"

(emphasis added).  That construct suggests that the Legislature

meant to permit the retention only of property equal in value to

the expenses incurred with respect to the administration of the

guardianship, i.e., property needed to satisfy *administrative*

costs, *administrative* liens, and *administrative* claims.

Given the discord between subdivisions (d) and (e) of Mental

Hygiene Law § 81.44, our analysis turns to the legislative

history of that section (see Ballman, 15 NY3d at 72; Roberts, 13

NY3d at 286).[2]  On this point the Sponsor's Memorandum is

_____

[2]      New York County Lawyers' Assn. also requires that we
consider subdivision (a) (4) of Mental Hygiene Law § 81.44 in
conjunction with subdivisions (d) and (e) of that section.  In
subdivision 81.44 (a) (4) the Legislature defined the phrase
"[s]tatement of assets and notice of claim" as "a written
statement under oath containing," among other things,

> "a description of the nature and approximate
> value of guardianship property at the time of
> the incapacitated person's death; with the
> approximate amount of any claims, debts or
> liens against the guardianship property,
> including but not limited to medicaid liens,
> tax liens and administrative costs, with an
> itemization and approximate amount of such
> costs and claims or liens."

As the Appellate Division majority noted, subdivision (a)
(4)can be read to provide that an administrative cost is but one
type of claim or lien.  Inasmuch as the phrase "statement of
assets and notice of claim" is used in subdivision (d), the
majority found in subdivision (a) (4) support for its
interpretation of subdivision (d) as providing that an
administrative cost is a type of claim or lien (see Shannon, 120
AD3d at 133).  However, while the language of subdivision (a) (4)
supports the Appellate Division majority's interpretation of
section 81.44 (d), it does not ultimately speak to the question

decisive.   The Appellate Division majority correctly noted that

the Sponsor's Memorandum reflects that section 81.44 was

"designed to facilitate the transition between a guardianship for

an incapacitated person and an estate after the death of such

incapacitated person" (Sponsor's Mem, L 2008, ch 175, 2008 Legs

Ann at 127; see 120 AD3d at 132).   But that memorandum further

explains that section 81.44 clarified "the rights of the personal

representative of the estate to marshal guardianship funds and

codifie[d] the right of the guardian to retain a reserve to cover

reasonably anticipated *administrative* expenses of the

guardianship" (Sponsor's Mem, L 2008, ch 175, 2008 Legs Ann at

127 [emphasis added]).   The reference to the retention of a

reserve to cover reasonably anticipated *administrative* expenses

is dispositive of the question before us.   Put simply, it compels

the conclusion that the Legislature did not intend for section

81.44 to permit a guardian to retain funds following the death of

an incapacitated person for the purpose of paying a claim (other

than a claim related to the administration of the guardianship)

against the incapacitated person that arose before that person's

death.   Inasmuch as Eastchester's claim for medical services

rendered to Shannon is unrelated to the administration of her

---

addressed in subdivisions (d) and (e) of section 81.44, i.e., the
purposes for which a guardian may withhold property from the
estate of a deceased incapacitated person and the nature of the
property that may be withheld.  In our view, subdivision (a)(4)
further highlights the discord among the subdivisions of 81.44
and the need for our consideration of the statute's legislative
history.

guardianship, we conclude that Mental Hygiene Law § 81.44 does not allow FSS Yonkers to withhold from Shannon's estate funds to pay Shannon's debt to Eastchester.

Accordingly, the order of the Appellate Division, insofar as appealed from, should be reversed, with costs, and the order of Supreme Court reinstated.

*    *    *    *    *    *    *    *    *    *    *    *    *    *    *    *    *

Order, insofar as appealed from, reversed, with costs, and order of Supreme Court, Bronx County, reinstated.  Opinion by Judge Fahey.  Chief Judge Lippman and Judges Read, Pigott, Rivera, Abdus-Salaam and Stein concur.

Decided June 10, 2015