This opinion is uncorrected and subject to revision before publication in the New York Reports.
--------------------------------------------------------------------

No. 113
Veronika Chauca,
          Appellant,
        v.
Jamil Abraham, et al.,
          Respondents.

          Stephen Bergstein, for appellant.
          Arthur H. Forman, for respondents.
          Anti-Discrimination Center, Inc.; City of New York;
National Employment Lawyers Association/New York (NELA/NY), amici curiae.

GARCIA, J.:

          The New York City Human Rights Law makes clear that punitive damages are available for violations of the statute, but does not specify a standard for when such damages should be awarded.  The Second Circuit has, by certified question, asked us to determine the applicable standard.  We conclude that,

- 1 -

consistent with the New York City Council's directive to construe the New York City Human Rights Law liberally, the common law standard as articulated in Home Insurance Co. v American Home Prods. Corp. (75 NY2d 196, 203-204 [1990]) applies. Accordingly, a plaintiff is entitled to punitive damages where the wrongdoer's actions amount to willful or wanton negligence, or recklessness, or where there is "a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard" (see Home Ins. Co. v Am. Home Prods. Corp., 75 NY2d 196, 203-204 [1990]).

I.

Plaintiff, a physical therapy aide, sued her former employer and two supervisory employees for sex and pregnancy discrimination under Title VII (42 USC §§ 2000e [k], 2000e-2 [a]), the Family Medical Leave Act (29 USC § 2601), the New York State Human Rights Law (Executive Law § 296 [1] [a]), and the New York City Human Rights Law (NYC Admin Code § 8-107 [1] [a]) (NYCHRL) in the United States District Court for the Eastern District of New York. At trial, plaintiff's counsel requested a jury instruction on punitive damages under the NYCHRL. In considering the request, the court applied to the NYCHRL the standard for punitive damages found in Title VII, namely, whether plaintiff had submitted evidence that her employer had intentionally discriminated against her with malice or reckless indifference to her protected rights, and denied the instruction. The court stated, "[t]here is nothing here that supports punitive

damages . . . . There's no showing of malice, reckless indifference, that there was an intent to violate the law. They may have violated the law, which is what you are going to try to prove, but there is certainly no evidence of intent." The jury found defendants liable for pregnancy discrimination and awarded plaintiff $10,500 in compensatory damages and $50,000 in pain and suffering.

Plaintiff appealed, arguing that the district court erred in importing the Title VII standard. After noting that the NYCHRL "does not articulate a standard for a finding of employer or employee liability for punitive damages," the Second Circuit acknowledged that the passage of the 2005 Local Civil Rights Restoration Act (NYC Admin Code § 8-130 [a] [Restoration Act]) and subsequent related amendments, calling for a liberal construction of all provisions of the NYCHRL in all circumstances, called into question the Second Circuit's 2001 holding in Farias v Instructional Systems, Inc. (259 F3d 91 [2d Cir 2001]) that Title VII's standard for punitive damages applies to the NYCHRL (Chauca v Abraham, 841 F3d 86, 91-92 [2d Cir 2016]). The Second Circuit noted that the Restoration Act "otherwise provides no specific guidance" regarding how to interpret the NYCHRL where the statute is silent as to the applicable standard (id. at 88). Accordingly, the Second Circuit certified the following question: "What is the standard for finding a defendant liable for punitive damages under the New

York City Human Rights Law?"

## II.

The NYCHRL prohibits an employer from "refus[ing] to hire" or "discharg[ing] from employment" anyone because of their gender.[1]  The NYCHRL provides for compensatory and punitive damages and other remedies against employers and employees found directly or vicariously liable for discrimination, a provision the City Council included in the NYCHRL in 1991 (NYC Admin Code § 8-502 [a]).  Employers exposed to a punitive damages charge can mitigate punitive damages based on vicarious liability where they can prove the existence of certain policies established to deter discrimination (see id. § 8-107 [13] [d] - [e]).  Despite the clear intention to make punitive damages available, there is no provision in the NYCHRL setting a standard for imposing them.  In light of this silence in the statute, we must now determine what standard applies for awarding punitive damages under the NYCHRL.

### A.

The "starting point in any case of interpretation must always be the language itself, giving effect to the plain meaning thereof" (Matter of Shannon, 25 NY3d 345, 351 [2015]).  It is a well-established principle of statutory construction that words of technical or special meaning are used by the legislature, "not loosely, but with regard for their established legal

---

[1] Discrimination on the basis of pregnancy is a form of gender discrimination (see Elaine W. v Joint Diseases N. Gen. Hosp., Inc., 81 NY2d 211 [1993]).

significance, and in construing a statute a technical meaning should be given to technical words, unless a contrary meaning is unmistakably intended" (People v Wainwright, 237 NY 407, 412 [1924]; see McKinney's Cons Laws of NY, Book 1 Statutes § 233 ["when a word having an established meaning at common law is used in a statute, the common law meaning is generally followed"]).

"Punitive damages" -- as used in section 8-502 -- is a legal term of art that has meaning under the New York common law. Punitive damages are intended not only to "punish the tortfeasor" but also to "deter future reprehensible conduct" (Ross v Louise Wise Servs., Inc., 8 NY3d 478, 489 [2007]; Hartford Acc. & Indem. Co. v Village of Hempstead, 48 NY2d 218, 226 [1979]).  In our 1990 decision in Home Insurance Co., we articulated the punitive damages standard as  "essentially . . . conduct having a high degree of moral culpability which manifests a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard" (75 NY2d at 203-204 [citations and internal quotation marks omitted]).

Plaintiff, relying almost exclusively on the legislative intent of the NYCHRL and the Restoration Act, argues that she should be entitled to a punitive damages charge upon *any* showing of liability.  Under plaintiff's approach, any discrimination case that goes to a jury would be accompanied by a punitive damages charge without any guidance as to when to award such damages.  In plaintiff's view, punitive damages should be

available in any situation where compensatory damages are available; the required showing of entitlement to either form of damages would be identical.  The dissent agrees, and argues that the Restoration Act's liberal construction principles mandate a holding that "a punitive damages charge is automatic on a finding of liability" (dissenting op at 7).

We reject that approach.  Punitive damages differ conceptually from compensatory damages and are intended to address "gross misbehavior" or conduct that "wilfully and wantonly causes hurt to another" (Thoreson v Penthouse Int'l, 80 NY2d 490, 497 [1992]).  Indeed, this Court has noted that "[n]ot only do [punitive damages] differ in purpose and nature from compensatory damages, but they may only be awarded for exceptional misconduct which transgresses mere negligence" (Sharapata v Town of Islip, 56 NY2d 332, 335 [1982]).  Punitive damages represent punishment for wrongful conduct that goes beyond mere negligence and are warranted only where aggravating factors demonstrate an additional level of wrongful conduct (see Home Ins. Co., 75 NY2d at 203-204).  Accordingly, there must be some heightened standard for such an award.

Plaintiff's assertion that the mitigation provisions discussed in section 8-107 (13) support the argument that punitive damages are available to any employment discrimination plaintiff, without the need to show a heightened level of culpability, lacks merit.  This section provides a way for an

employer, when faced with vicarious liability, to mitigate
punitive damages, where they are otherwise warranted, if certain
factors are established.  Moreover, as the Second Circuit noted,
that section applies only to employers' vicarious liability once
the punitive damages standard has been met and cannot be read to
address the standard itself (see Chauca, 841 F3d at 92 n 3).
Nothing in that provision requires a punitive damages charge
whenever liability, vicarious or direct, is demonstrated.
Indeed, the dissent's assertion that a punitive damages charge is
"automatic" is not a "reasonably possible" interpretation of the
statute (dissenting op at 13).

B.

Defendants contend that the Title VII standard for
punitive damages, employed by the Second Circuit in Farias,
should apply (see 259 F3d at 102).  We reject this approach as
contrary to the intent of the Council.

In Farias, the Second Circuit held that a plaintiff
must show that a defendant engaged in intentional discrimination
with malice or reckless indifference to a protected right in
order to obtain punitive damages under the NYCHRL (id. at 100;
see also Koldstadt v Am. Dental Ass'n, 527 US 526, 529-30
[1999]).  The Title VII standard requires "intentional
discrimination . . . with malice or with reckless indifference to
the . . . protected rights of an aggrieved individual" and the
Supreme Court has specified that "the terms 'malice' or 'reckless

indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination" (Kolstad, 527 US at 529-30).

However, in 2005, subsequent to Farias, the City Council passed the Restoration Act, amending the New York City Administrative Code to ensure that "[t]he provisions of [the NYCHRL] shall be construed liberally . . . regardless of whether federal or New York State civil and human rights laws . . . have been so construed" (NYC Admin Code § 8-130).  Expressing concern that the NYCHRL was being too strictly construed, the amendment established that similarly worded state or federal statutes may be used as interpretive aids only to the extent that the counterpart provisions are viewed "as a floor below which the City's Human Rights Law cannot fall, rather than a ceiling above which the local law cannot rise," and only to the extent that those state or federal law decisions may provide guidance as to the "uniquely broad and remedial purposes of the local law" (Local Law No. 85 [2005] of City of New York §§ 1, 7).  In a report on the amendments (see 2005 NYC Legislative Annual, p. 537), the Committee on General Welfare rejected prior reasoning by this Court that the City Council "would need to amend the City HRL to specifically depart from a federal doctrine if it wanted to do so" (McGrath v Toys "R" Us, Inc., 3 NY3d 421, 423 [2004]).  As a result, this Court has acknowledged that all provisions of the NYCHRL must be construed "broadly in favor of discrimination

plaintiffs, to the extent that such a construction is reasonably possible" (Albunio v City of NY, 16 NY3d 472, 477-478 [2011]).

In 2016, the City Council again amended the construction provision of the NYCHRL to provide additional guidance, identifying cases, including Albunio, that had "correctly understood and analyzed the liberal construction requirement . . . and that have developed legal doctrines accordingly that reflect the broad and remedial purpose of this title" (NYC Admin Code § 8-130 [c]).  The Council identified these cases in order to, among other things, "illustrate best practices when engaging in the required analysis" and to "endorse the legal doctrines where they were developed pursuant to liberal construction analyses" (id.).

In contrast to the approach in Kolstad, the standard articulated in Home Insurance requires neither a showing of malice or awareness of the violation of a protected right, representing the lowest threshold, and the least stringent form, for the state of mind required to impose punitive damages.  By implementing a lower degree of culpability and eschewing the knowledge requirement, applying this standard adheres to the City Council's liberal construction mandate while remaining consistent with the language of the statute (see NYC Admin Code § 8-502 [a]).[2]

---

[2] This holding does not affect the common law standard for punitive damages in any context beyond the NYCHRL.

Moreover, NYCHRL violations, by their very nature, inflict serious harm "to both the persons directly involved and the social fabric of the city as a whole" (Rep of Comm on Gen Welfare, Local Law No. 85 [2005], 2005 NY City Legis Ann, at 537). The standard for punitive damages articulated in Home Insurance, while requiring an appropriate showing of heightened culpability for punitive damages consistent with the language of the provision at issue, is nevertheless properly reflective of the serious and destructive nature of the underlying discriminatory conduct and the goal of deterring "future reprehensible conduct" (Ross, 8 NY3d at 489). Furthermore, subjecting NYCHRL defendants to punitive damages under this standard encourages nondiscriminatory behavior and the development and application of appropriate employment criteria. In sum, this approach is the most liberal construction of the statute that is "reasonably possible" and furthers the purpose of the NYCHRL.

IV.

We hold, therefore, that the standard for determining punitive damages under the NYCHRL is whether the wrongdoer has engaged in discrimination with wilful or wanton negligence, or recklessness, or a "conscious disregard of the rights of others or conduct so reckless as to amount to such disregard" (see Home

Ins. Co., 75 NY2d at 203-04.[3]

Accordingly, the certified question should be answered in accordance with this opinion.

---

[3] As noted earlier, the reference to "rights" here does not impose a requirement that the wrongdoer know (s)he is violating the law.

Chauca v Abraham

No. 113


WILSON, J.(dissenting):

I agree with my colleagues' conclusion that the Title VII standard for punitive damages does not govern discrimination cases brought under the New York City Human Rights Law (NYCHRL). We part ways, however, on how the New York City Council chose to supplant it. I do not agree that the Council adopted New York's common law standard, which is not mentioned anywhere in the NYCHRL or its legislative history. Instead, I agree with Ms. Chauca that the City Council amended the NYCHRL to entitle a plaintiff to a punitive damages charge whenever liability is proved, unless an employer has adopted and fully implemented the antidiscrimination programs, policies, and procedures promulgated by the Commission on Human Rights, as an augmentation to compensatory damages, and would answer the certified question accordingly.

I.

For the better part of a century, New York City has demonstrated its pioneering commitment to human rights through repeated revisions to its Human Rights Law. The City Council's Committee on Civil Rights recently described the NYCHRL as "one of the most expansive and comprehensive human rights laws in the

- 1 -

nation" (Report of the Committee on Civil Rights on Local Law 35 of 2016 [2016 Report]).

In the 1991 revisions, which effected a complete overhaul of that law, the City Council made clear that the NYCHRL not only served an important humanitarian objective, but also was designed to further nearly every traditional governmental purpose. Those revisions reemphasized the New York City Council's earlier finding that there is "no greater danger to the health, morals, safety and welfare of the city and its inhabitants than the existence of groups prejudiced against one another and antagonistic to each other because of their actual and perceived differences, including those based on . . . gender" (NYC Admin Code § 8-101). The revisions also focused new attention on the scourge of systemic discrimination, which "poses a substantial threat to, and inflicts significant injury upon, the city that is economic, social and moral in character" as well as "distinct from the injury sustained by individuals as an incident of such discrimination" (id. § 8-401). The Council found that systemic discrimination, including systemic employment discrimination, causes economic injury to New York that "severely diminishes its capacity to meet the needs of those persons living and working in, and visiting, the city" (id.). Moreover, it found that the social and moral consequences "polarize[] the city's communities, demoralize[] its inhabitants and create[] disrespect for the law", thereby frustrating "the city's efforts

to foster mutual respect and tolerance among its inhabitants and to promote a safe and secure environment" (id.).

To better combat those ills, the 1991 revisions supplemented the pre-existing administrative enforcement mechanism.  Under prior law, individuals could secure their own redress and prevent further municipal injuries only by bringing a complaint before the City Commission on Human Rights.  Under the revised law, both those individuals and the corporation counsel were given the authority to institute a civil action without recourse to the Commission (id. § 8-402; 8-502).  As relevant here, the NYCHRL now provides that "any person claiming to be aggrieved by an unlawful discriminatory practice . . . shall have a cause of action in any court of competent jurisdiction for damages, including punitive damages, and for injunctive relief and such other remedies as may be appropriate" (id. [emphasis added]).  The hope of then-Mayor Dinkins was that the creation of a private right of action would "supplement the Commission's enforcement efforts and ease a portion of its caseload burden" (Statement of David Dinkins at the public hearing on local law 39, June 18, 1991 [Dinkins Statement]).  The twin barrels of Commission and private enforcement, were both designed to "ensure discrimination plays no role in the public life of the City" (id.).  Achieving that goal requires ensuring that "a person can be compensated for the damages she has suffered" and that penalties "exert a strong deterrent effect" against "the harm

. . . bias does to the social fabric of the city" (id.).   In addition to those and other substantive amendments, the 1991 revisions emphasized -- without materially amending -- the requirement that the NYCHRL must "be construed liberally for the accomplishment of the purposes thereof" (former NYC Admin Code § 8-130).  The accompanying committee report directed our court and others to pay "particular attention" to that obligation and found it "imperative that restrictive interpretations of state or federal . . . provisions are not imposed upon city law" (Report of the Committee on General Welfare on Local Law 39 of 1991 [1991 Report]).  Mayor Dinkins repeated that instruction in his signing statement, which implored the judiciary to reject "restrictive state and federal rulings" and to "take seriously the requirement that this law be liberally and independently construed" (Dinkins Statement).  Only by following those instructions could the courts give proper force to a human rights law that was, in the words of the mayor who signed it, "the most progressive in the nation" (id.).

Despite clear instructions, courts interpreting the NYCHRL failed to construct it liberally and independently, instead importing narrowing constructions of Title VII and the Executive Law.  In the Local Civil Rights Restoration Act of 2005, the City Council informed the courts that they had construed the law "too narrowly to ensure protection of the civil rights of all persons" covered by it (Local L 85 § 1 [2005]). It

repeated that the law must instead be construed "independently from similar or identical provisions of New York state or federal statutes" (id.). It augmented the construction provision of the NYCHRL, section 8-130, to include that instruction and to further distinguish the law for its "uniquely broad and remedial purposes" (NYC Admin Code § 8-130). Finally, it amended certain other sections to supersede specific cases that had strayed from those purposes. The clear thrust of the Restoration Act is that courts should interpret the NYCHRL in the manner that best furthers its goals of protecting aggrieved individuals and the social fabric of New York City (see generally Report of the Committee on General Welfare on Local Law 85 of 2005 [2005 Report]; Testimony of Craig Gurian of the Anti-Discrimination Center Regarding Intro 22A [Gurian Testimony]).

Those reiterated admonishments proved only partially effective. In 2016, finding that only "some judicial decisions ha[d] correctly understood and analyzed the requirement of section 8-130", the Council patiently fired a third salvo in its fight to protect the NYCHRL from being subverted by the courts (Local L 35 § 1 [2016]). The purpose of that year's revisions was "to provide additional guidance for the development of an independent body of jurisprudence for the New York [C]ity [H]uman [R]ights [L]aw that is maximally protective of civil rights in all circumstances" (id.). Consistent with that purpose, the Council amended section 8-130 to direct courts toward three

decisions that best exemplified the correct approach to interpreting the law: Albunio v City of New York, Bennett v Health Management Systems Inc., and Williams v New York City Housing Authority (NYC Admin Code § 8-130 [c]; 16 NY3d 472 [2011]; 92 AD3d 29 [1st Dept 2011]; 61 AD3d 62 [1st Dept 2009]). Those decisions make clear that, as we stated in Albunio, courts must construe the NYCHRL "broadly in favor of discrimination plaintiffs, to the extent such a construction is reasonably possible" (16 NY3d at 477-478).

## II.

The majority follows that interpretive guideline partway, and I join the portion of its opinion that considers and rejects Farias and the Title VII standard in the context of the New York City Human Rights Law (cf. Farias v Instructional Systems, Inc., 259 F3d 91 [2d Cir 2001]). However, the plain language of section 8-502 and structural features of chapter 1, coupled with the legislative history of the title, compel the holding that the standard for finding a defendant liable for punitive damages under the NYCHRL can be borrowed from neither federal jurisprudence nor our common law.[1] Instead, the revised

---

[1] The majority chastises Ms. Chauca for relying "almost exclusively on the legislative intent of the NYCHRL and the Restoration Act" (majority op at 5). That mischaracterizes her argument. Even if it did not, the statutory text directs courts to model their NYCHRL analyses on Bennett, which held that "while examining the specific language of statutory provisions is part of our inquiry, we must also look to the underlying purpose and

statute provides that a punitive damages charge is automatic on a finding of liability, that those damages must be mitigated if certain factors are established, and can be eliminated entirely by adopting such policies, programs, and procedures as are developed by the Commission on Human Rights.  Granted, that construction would make the NYCHRL the most progressive in the nation.

Section 8-502 provides plaintiffs a cause of action "for damages, including punitive damages, and for injunctive relief and such other remedies as may be appropriate, unless such person has filed a complaint [with the Commission or with the State Division of Human Rights]" (NYC Admin Code § 8-502 [a]). Facially, then, Ms. Chauca and any similarly aggrieved individual is entitled to an award of punitive damages upon a showing of liability.  We "construe unambiguous language to give effect to its plain meaning" (Zakrzewska v New School, 14 NY3d 469, 479 [2010]; see also majority op at 4-5 ["The 'starting point in any case of interpretation must always be the language itself, giving effect to the plain meaning thereof'"], quoting Matter of Shannon, 25 NY3d 345, 351 [2015]).

Here, that plain meaning is further supported by structural features of the NYCHRL. Section 8-107 (1) imposes

_____

the statute's history as we are mindful that in the interpretation of statute, the spirit and the purpose of the act and the objects to be accomplished must be considered. The legislative intent is the great and controlling principle" (92 AD3d at 35 n 2, quoting Matter of Meegan v Brown, 16 NY3d 395, 403 [2011]).

liability directly on employers for their own discriminatory
conduct.  Section 8-107 (13) (b) additionally imposes vicarious
liability for employment discrimination on employers in three
instances: where the offending employee exercised managerial or
supervisory responsibility, where the employer knew of the
offending employee's discriminatory conduct and either acquiesced
in such conduct or failed to take immediate and appropriate
corrective action, and where the employer should have known of
the offending employees' discriminatory conduct and failed to
exercise reasonable diligence to prevent it (NYC Admin Code § 8-
107 [13] [b] [1]-[3]).  In the first two instances, an employer's
demonstration of certain factors detailed in subsection (13) (d)
"shall be considered in mitigation of the amount of civil
penalties to be imposed by the commission . . . or in mitigation
of civil penalties or punitive damages which may be imposed
pursuant to chapter four or five"; only in the last instance can
the demonstration of those factors create an actual shield to
liability (id. § 8-107 [13] [e]; see also Zakrzewska, 14 NY3d at
479-480).  In all instances, were an employer to adopt and
implement fully the best practices for preventing and detecting
discrimination as promulgated by the Commission, the employer
would be immune from punitive damages (NYC Admin Code § 8-107
[13] [f]).[2]

_____

[2] Recognizing the strict aspects of that regime, the City Council
noted that the new scheme  "would make the City's law unique
among civil rights laws in that the standards are designed not
only to deter discriminatory conduct by holding employers

That interrelated set of provisions demonstrates the Council contemplated precisely what the plain language of section 8-502 calls for: automatically charging punitive damages to the jury upon a finding of liability (unless the employer proved the immunity provided by section 8-107 [13] [f]), regardless of whether an employer or employee engaged in intentional discrimination or discriminated with malice or reckless indifference to the individual's rights.

Absent an automatic charge, the provisions' assumption that punitive damages are available to be mitigated in any employment discrimination case, but can only be eliminated in a subset of cases, cannot make sense. In addition, using either the federal or the majority's standard for awarding punitive damages would reduce sections (13) (d), (e), and (f) to mere surplusage. No employer who engaged in discrimination with willful or wanton negligence, or recklessly, or displayed a conscious disregard of the rights of others -- the test advocated by the majority -- could hope to avail itself of those defenses.

The majority, like the Second Circuit, disputes the relevance of these provisions because, "even if [Ms.] Chauca were correct that the mitigation and avoidance provisions establish the presumption that punitive damages are always available in

---

accountable but, of equal importance, they are designed to provide employers with an incentive to implement policies and procedures that reduce, and internally resolve, discrimination claims . . . employers could mitigate their liability for civil penalties or punitive damages or liability for the act of an employee or agent" (1991 Report).

cases of imputed liability, this would not answer the question of the punitive damages standard for liability based on an employer's own actions" (<u>Chauca v Abraham</u>, 841 F3d 86, 92 n 3 [2016]; <u>see</u> <u>also</u> majority op at 7 ["that section applies only to employers' vicarious liability once the punitive damages standard has been met and cannot be read to address the standard itself"]).  The consequence of their argument, however, is that employers would be automatically subject to punitive damages when they are merely vicariously liable for discrimination pursuant to section 8-107 (13), but unlikely to face them when directly liable under section 8-107 (1).  That is, under the majority's interpretation, if an employer had an outright policy of discrimination, punitive damages would be assessed under the higher common-law standard, but if the employer was only vicariously liable for an employee's discriminatory conduct, punitive damages would automatically attach, subject to possible mitigation.  That perverse result cannot have been the City Council's intention.

Finally, as reflected in section 8-107 (13) (e), the NYCHRL often treats punitive damages under chapter 5 in the same breath as civil penalties under chapter 1.  In the latter case, the Commission may "vindicate the public interest" by imposing a considerable fine without first proving the discrimination was "willful, wanton or malicious" (<u>id.</u> § 8-126).  If punitive damages are to function as the private cause of action analogue

to the Commission's civil penalties, they must be awarded,

similarly, without a showing of enhanced culpability.[3]  Thus,

structural features of the NYCHRL militate in favor of

interpreting it to require an automatic charge.  Taken together

with the plain meaning of section 8-502, those features make that

interpretation more plausible than the majority's.

        The interpretation is all the more plausible for

accomplishing the purposes of the NYCHRL in a familiar and easily

administrable way.  The method is familiar because other statutes

that, like the NYCHRL, are intended to encourage civil actions by

private attorneys general automatically award damages in excess

of compensatory damages.  For instance, treble damages are

automatic under the federal antitrust laws and the RICO Act,

simply on a finding of liability; indeed, intent is not an

element of civil violations of the antitrust laws, whereas it is

a necessary element of Title VII.  The method is easily

administrable because it foregoes instructing a jury in the

niceties of the common-law standard for when punitive damages

should be awarded, and instead charges them only with calculating

an appropriate amount.  The New York Pattern Jury Instructions,

---

[3] Statements made by one of the law's co-sponsors at its signing
indicate chapter 5 was intended to allow private plaintiffs to
vindicate the public interest in the absence of robust
enforcement by the Commission (Statement by Stanley Michel at the
public hearing on local law 39, June 18, 1991 [describing the
private right of action as "the teeth" of the revisions and "so
important in these times when we don't have enough staff and the
problems with the budget in getting . . . the government to
enforce this legislation"]).

which already bifurcate the guidance for determining whether

punitive damages should be awarded and the guidance for deciding

the amount of the award, contain a list of factors relevant to

that calculation.  It would be a simple matter to charge each

jury, rather than only those that satisfy the majority's test, to

consider that list, the specific mitigating factors elaborated in

section 8-107 (13) (d), and the standard language regarding

proportionality to the harm, to compensatory damages, and to the

defendant's financial condition.[4]  In refusing to countenance the

efficacy of this approach, the majority must mean that it

disagrees with the policy judgement made by the City Council --

that it believes entitling additional successful plaintiffs to

awards that exceed their actual damages is a bad idea.

Although the preceding interpretation is in derogation

of the "well-established principle of statutory construction that

words of technical or special meaning are used by the

legislature, 'not loosely, but with regard for their established

legal significance,'" such departures are permitted when

"unmistakably intended" (majority op at 5, quoting People v

Wainwright, 237 NY 407, 412 [1924]; Wainwright, 237 NY at 412).

As the foregoing paragraphs demonstrate, in drafting the NYCHRL,

---

[4] Indeed, juries' and appellate courts' recourse to those
standard factors may partially explain the City Council's
decision to authorize "punitive" rather treble or some hitherto
unknown form of damages.  In other words, the City Council drew
on the body of law governing the amount of punitive damages, even
as it departed from the body governing the standard for awarding
those damages in the first place.

the City Council -- whose purpose was the private vindication of both individual and societal human rights -- unmistakably intended for "punitive damages" to mean damages any jury may consider awarding in excess of the award required to make a plaintiff whole.  Just as the presumption in favor of interpreting "state and local civil rights statutes . . . consistently with federal precedent" may yield to section 8-130, so too can our general practice of following the established common law meaning of a phrase (cf. McGrath v Toys "R" Us, Inc., 3 NY3d 421, 429, superseded by statute as stated in Williams, 61 AD3d at 74).

Alternatively, one could understand the NYCHRL not as departing from the common-law standard for when punitive damages may be awarded, but as making a legislative finding that -- in line with the "Restoration Act principle that discrimination violations are per se 'serious injuries'" -- employment discrimination per se satisfies that standard (Williams, 61 AD3d at 77 [quoting the 2005 Report's finding that discriminatory acts "cause serious injury, to both the persons directly involved and the social fabric of the City as a whole, which will not be tolerated"]).  Home Insurance's description of the harms for which punitive damages may be awarded tracks the outrage toward discrimination and its injurious effects on society expressed in sections 8-101 and 8-401 and in the revisions' repeated calls to combat discriminatory conduct with law enforcement-like methods

(see e.g. 75 NY2d 196, 203 [1990] [referring to punitive damages as a "hybrid between a display of ethical indignation and the imposition of a criminal fine"]).  All NYCHRL suits are, like punitive damages, "intended not only to 'punish the tortfeasor' but also to 'deter future reprehensible conduct'" (see majority op at 5, quoting Ross v Louise Wise Servs., Inc., 8 NY3d 478, 489 [2007]).  In drafting section 8-502, the City Council determined juries should have a regular opportunity to consider whether to punish and deter an act that "menace[s] the institutions and foundation of a free democratic state": discriminating against an employee because of, inter alia, her gender, race, or sexual orientation (NYC Admin Code § 8-101).  It has determined that firing a woman because of her pregnancy is "reprehensible" conduct "evidencing a high degree of moral culpability which manifests a conscious disregard of the rights of others" (id.; Home Ins. Co., 75 NY2d 196 at 203).  The majority disagrees.


                              III.

        I believe the above interpretation is compelled by the statutory language and the legislative history. Suppose that I am wrong.

        As long as the preceding interpretation is even "reasonably possible," it becomes incumbent on the courts to adopt it over the one offered by the majority (Albunio, 16 NY3d at 477-478; see NYC Admin Code § 8-130 [c]).

As an initial matter, there is no reason to exempt an interpretation imported from our common law from the same scrutiny as one imported from federal or state statutes. Although the 1991 and 2005 revisions had focused on preventing the rote application of statutory law, the three cases cited in the construction provision (as well as the 2016 legislative history, which draws on them at some length) suggest that the City Council sought to free the NYCHRL from the strictures of statutory and decisional law. The 2016 committee report described the most recent revisions as requiring courts to apply the liberal construction provision "in every case and with respect to every issue" and to understand that "legal doctrine might need to be revised to comport with the requirements of § 8-130" (2016 Report). "[T]here are no provisions of the law or judge-made doctrines that stand outside the liberal construction requirements" (id. [emphasis added]). The cases themselves consider it "beyond dispute that the City HRL now explicitly requires an independent liberal construction in all circumstances" (Bennett, 92 AD3d at 35); section 8-130 is intended to "allow independent development of the local law 'in all its dimensions'" (Williams, 61 AD3d at 74, quoting Craig Gurian, A Return to Eyes on the Prize: Litigating Under the Restored New York City Human Rights Law, 33 Fordham Urb LJ 255,

280 [2006] [describing the construction provision as "a continuing shield and sword for the City Human Rights Law"]).[5]

The present case illustrates the merits of the City Council's decision to slip the bonds of the common law.  The idea that there is a static common law is an even greater "fallacy" than the idea that there is a "fixed body of 'federal law'" (see Gurian Testimony).  The common law may, like the state and federal civil rights laws, be transformed over time.  As the discordant parade of increasingly severe cases cited by the majority makes clear, our common-law standard has suffered exactly that fate in the 27 years since Home Insurance (and may now, in many instances, fall below the floor established by Title VII) (see majority op at 6; see also Marinaccio v Town of Clarence, 20 NY3d 506 [2013]; Dupree v Giugliano, 20 NY3d 921 [2012]; Ross, 8 NY3d 478) -- a fact the majority recognizes in walling off its decision from today's punitive damages jurisprudence (majority op at 10 n 2).[6]  Indeed, any invocation

_____

[5] Gurian's article, although separate from the legislative history, is an "extensive analysis of the purposes of the Local Civil Rights Restoration Act, written by one of the Act's principal authors" that was used extensively in Williams and has thus been ratified by section 8-130 (c) (Williams, 61 AD3d at 67 n 3, quoting Ochei v Coler/Goldwater Mem. Hosp., 450 F Supp 2d 275, 283 n 1 [SDNY 2006]).

[6] Although the majority purports to reject the Title VII standard for punitive damages in favor of New York's common law standard, in footnote two, it cautions: "This holding does not affect the common law standard for punitive damages in any context beyond the NYCHRL."  Unless footnote 2 is, like one's

of "the" common law standard glosses over the reality that our courts' application of punitive damages is "confusing" and "far from uniform," varies -- perhaps with good reason -- by whether an action sounds in tort or contract, and is, in short, hardly standard (John Leventhal and Thomas Dickerson, Punitive Damages: Public Wrong or Egregious Conduct? A Survey of New York Law, 76 Alb L Rev 961 [2013]; id. at 1008). Although the majority employs the version of that standard extant at the time the 1991 revisions introduced punitive damages into the NYCHRL, a better way to protect against the drafters' fear that the law would be "automatically ratcheted down" would be to adopt the reading of it supported in Part II (see Gurian Testimony).

That reading is the one that best serves the purpose of the successive revisions to the NYCHRL, which must be construed in the manner most favorable to discrimination plaintiffs (and, thus, to the commonweal). As we have seen, that purpose is to be "maximally protective of civil rights in all circumstances" by "'meld[ing] the broadest vision of social justice with the strongest law enforcement deterrent'" (Local L 35 § 1 [2016]; 2016 Report, quoting Williams, 61 AD3d at 68]). If, as amici

---

appendix or wisdom teeth, vestigial and purposeless, it must mean that the standard in the majority's opinion is not New York's common law standard, but something different that the majority does not wish to creep into the common law standard, and would instead cabin to NYCHRL cases.

explain, punitive damages are the only effective deterrent because employers carry insurance against compensatory damages and attorney's fees, but cannot obtain it for punitive damages as a matter of New York's public policy, then only by automatically imposing those damages with allowances for mitigating factors and immunity for full compliance with Commission policies can the NYCHRL achieve its "very specific vision" of "no tolerance for discrimination in public life" (Home Ins. Co., 75 NY2d at 200; 2016 Report).

        In fact, the 2005 Restoration Act modeled an amendment to section 8-502 strikingly similar to the one Ms. Chauca proposes today. Rejecting this Court's decision to authorize attorney's fees only in the same narrow circumstances as the federal statute, that Act updated the NYCHRL with a bespoke definition of "prevailing" that awarded fees to considerably more plaintiffs and thereby encouraged more rigorous enforcement (see NYC Admin Code § 8-502 [g]; 2005 Report). That update, like all of the substantive 2005 amendments, was meant to "illustrate" desirable changes to the law (Williams, 61 AD3d at 74). The expanded construction provision was intended, in the same vein, to "obviate[e] the need for wholesale textual revision of the myriad specific substantive provisions of the law" by the legislature and "accelerate the process by which other doctrines

inconsistent with the commands of [the] Restoration Act are abandoned" (2005 Report; 2016 Report).  Abandoning not only the Title VII but also the common law standard for punitive damages fulfills that goal as well as the law's express purpose.

Because the mandates of the NYCHRL are as clear as they are uniquely broad and remedial, and because discrimination is "a profound evil that New York City, as a matter of fundamental public policy, seeks to eliminate," I would answer the certified question consistent with this dissent (Bennett, 92 AD3d at 38). It would be far better to have the City Council tell us we have gone a bit too far than to have it admonish us a fourth time for standing in the way of its efforts to end discrimination.

*    *    *    *    *    *    *    *    *    *    *    *    *    *    *    *    *

Following certification of a question by the United States Court of Appeals for the Second Circuit and acceptance of the question by this Court pursuant to section 500.27 of this Court's Rules of Practice, and after hearing argument by counsel for the parties and consideration of the briefs and the record submitted, certified question answered in accordance with the opinion herein.  Opinion by Judge Garcia.  Chief Judge DiFiore and Judges Rivera, Stein, Fahey and Feinman concur.  Judge Wilson dissents in an opinion.


Decided November 20, 2017